**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 19 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

LOIS NADEAN SMITH,

    Petitioner-Appellant,

    v.

NEVILLE MASSEY, Warden,
Oklahoma State Penitentiary,

    Respondent-Appellee.

No. 99-7143

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. CIV-97-219-S)**

---

Gregory R. Piche, of Holland & Hart, Denver, Colorado, and Randy Bauman, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for the appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, with her on the brief), Oklahoma City, Oklahoma, for the appellee.

---

Before **BRORBY** , **EBEL** , and **BRISCOE** , Circuit Judges.

---

**BRISCOE** , Circuit Judge.

---

Petitioner Lois Nadean Smith, an Oklahoma state prisoner convicted of first

degree murder and sentenced to death, appeals the district court's denial of her 28

U.S.C. § 2254 petition for writ of habeas corpus. We exercise jurisdiction

pursuant to 28 U.S.C. § 1291 and affirm.

I.

The following is a summary of the underlying facts, as recounted by the

Oklahoma Court of Criminal Appeals (OCCA) in disposing of Smith's direct

appeal:

> The evidence shows that the appellant, her son Greg, and Teresa Baker [DeMoss] picked up Cindy Baillee at a Tahlequah motel early on the morning of July 4, 1982. Baillee had been Greg's girlfriend, but allegedly had made threats to have him killed.
>
> As the group drove away from the motel, appellant confronted Ms. Baillee with rumors that she had arranged for Greg's murder. When Ms. Baillee denied making any threats or arrangements, appellant choked the victim and stabbed her in the throat with a knife found in the victim's purse. The car traveled to the home of Jim Smith, the appellant's ex-husband and Greg's father in Gans, Oklahoma. Present at the house were Smith and his wife Robyn. [Robyn] left shortly after the group arrived.
>
> While at the Smith house, appellant forced Ms. Baillee to sit in a recliner chair. She then threatened to kill Ms. Baillee, and taunted her with a pistol. Finally, appellant fired a shot into the recliner, near Ms. Baillee's head. She then fired a series of shots at Ms. Baillee, and the wounded victim fell to the floor. As Greg Smith reloaded the pistol, appellant laughed while jumping on the victim's neck. Appellant took the pistol from Greg and fired four more bullets into the body. A subsequent autopsy showed Ms. Baillee had been shot five times in the chest, twice in the head, and once in the back. Five of these gunshot wounds were fatal. The knife wound was also potentially fatal.

Smith v. State, 727 P.2d 1366, 1368 (Okla. Crim. App. 1986) (Smith I), cert.

denied, 483 U.S. 1033 (1987).

Smith and her son Greg were charged in the District Court of Sequoyah County, Oklahoma with murder in the first degree. Pursuant to defense counsel's motion, the cases against Smith and her son were severed for purposes of trial. Smith's case proceeded to trial on December 6, 1982. At the conclusion of the first-stage proceedings, the jury found Smith guilty of murder in the first degree. At the conclusion of the second-stage proceedings, the jury found the existence of two aggravating factors: (1) the murder was especially heinous, atrocious or cruel; and (2) Smith knowingly created a great risk of death to more than one person, and fixed Smith's sentence at death. Smith was formally sentenced by the state district court on December 29, 1982.

The OCCA affirmed Smith's conviction and sentence on direct appeal. Smith I, 727 P.2d at 1374. Smith filed an application for state post-conviction relief, which was denied after an evidentiary hearing. The denial of post-conviction relief was affirmed by the OCCA. Smith v. State, 915 P.2d 927, 931 (Okla. Crim. App.) (Smith II), cert. denied, 519 U.S. 970 (1996).

Smith filed her petition for writ of habeas corpus in federal district court on April 14, 1997, asserting six grounds for relief. She subsequently filed an amended petition asserting ten grounds for relief. The magistrate court conducted an evidentiary hearing on the issue of whether Smith was advised by trial counsel

of a potential conflict of interest arising out of counsel's representation of both Smith and her son and, if so, whether Smith knowingly and voluntarily waived any such conflict. In its order issued after the hearing, the magistrate court found that Smith was adequately advised of the potential for a conflict of interest and knowingly and voluntarily waived any such conflict of interest. The district court adopted the findings and recommendations of the magistrate regarding the conflict of interest issue and denied Smith's petition for writ of habeas corpus in its entirety. The district court granted Smith a certificate of appealability (COA) with respect to four issues. This court subsequently expanded the COA to include two additional issues.

## II.

Because Smith's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999), cert. denied, 120 S. Ct. 2222 (2000). Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts, and is not otherwise procedurally barred, this court may exercise its independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). In doing so, this court reviews the federal district

4

court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "Thus, [this court] may grant the writ if [it] find[s] the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case." Van Woudenberg v. Gibson, 211 F.3d 560, 566 (10th Cir. 2000) (citing Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000)).

*Ineffective assistance of trial counsel - conflict of interest*

Smith contends she was denied her Sixth Amendment right to effective assistance of counsel because her attorney, Monte Strout, simultaneously represented her and her son Greg against the murder charges even though they had conflicting interests. According to Smith, "there was ample evidence Greg

wanted Baillee killed and manipulated [Smith's] maternal protective instincts to accomplish that end." Smith's Opening Br. at 15. Due to the conflict of interest, however, Smith alleges that Strout failed to develop this theme at Smith's trial, "consistently attempted to exclude evidence pointing to Greg's culpability," and "consistently underemployed such evidence that came in naturally as witnesses related events." Id. The result, Smith argues, was that "the State had free rein to assert [she] was . . . the embodiment of maniacal evil," which in turn resulted in the jury sentencing her to death. Id.

A criminal defendant's Sixth Amendment right to effective assistance of counsel, which is rooted in "the fundamental right to a fair trial," Strickland v. Washington, 466 U.S. 668, 684 (1984), includes the right to conflict-free representation. Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). This right is unaffected by a defendant's decision to retain his or her own counsel. See Stouffer v. Reynolds, 168 F.3d 1155, 1161 (10th Cir. 1999). As the Supreme Court has noted, "[t]he vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection." Cuyler, 446 U.S. at 344.

Where, as here, a defendant raises no objection at trial, her later assertion that her counsel was representing potentially conflicting interests is insufficient to

establish a Sixth Amendment violation. Id. at 348. Instead, "[i]n order to establish a violation of the Sixth Amendment [right to effective counsel], a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected h[er] lawyer's performance." Id. (emphasis added). "During joint representation, an actual conflict of interest arises if the codefendants' interests 'diverge with respect to a material factual or legal issue or to a course of action.'" Edens v. Hannigan, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting Cuyler, 446 U.S. at 356 n. 3). "The adverse performance requirement is satisfied if the attorney took action on behalf of one client that was necessarily adverse to the defense of the other or failed to take action on behalf of one because it would adversely affect the other." Wilson v. Moore, 178 F.3d 266, 280 (4th Cir.) (internal quotations omitted), cert. denied, 120 S. Ct. 191 (1999). If a defendant asserting an ineffective assistance of counsel claim based on conflict of interest is able to make these showings, "[p]rejudice is presumed and the applicant is entitled to relief." Id.

Smith first raised the conflict of interest issue in her direct appeal. In particular, Smith argued that "the possibility of a conflict of interest was apparent to the trial judge and he should have taken action to remedy the apparent conflict." Smith I, 727 P.2d at 1369. In rejecting the issue, the OCCA noted there was "no record of an objection to th[e] appointment [of Strout to represent

7

Greg] based upon a conflict of interest, nor were any objections made by the codefendants." Id. The OCCA then identified and applied Cuyler, concluding:

> There is no evidence that a conflict of interest arose during the course of appellant's trial. She asserts, however, that an actual conflict of interest is shown by the defense theory in Greg Smith's trial that the appellant alone planned and carried out the killing of Cindy Baillee. But this theory was used only after the appellant's conviction, and was first presented by defense counsel during closing argument in Greg Smith's trial, which occurred six months after the appellant's conviction. She also asserts that defense counsel prevented the State from calling Greg Smith as a witness, and speculates concerning his possible testimony. The possibility which is not addressed by the appellant is that Greg Smith's testimony would have severely damaged his mother's case.
> As nothing in the record exists to alert the trial judge that a conflict of interest existed, and the appellant has not shown an actual conflict of interest, but merely speculated on the possibilities, we find this assignment of error to be without merit.

Id.

Smith reasserted the issue in her application for post-conviction relief, asserting in part that her counsel on direct appeal had inaccurately alleged that a possible conflict existed when, in fact, an actual conflict existed. Because the general issue had been raised by Smith in her direct appeal, the state district court concluded that further consideration of the issue was barred by res judicata and, in any event, Smith failed to demonstrate she was deprived of her right to effective assistance of counsel. Although the state district court conducted a limited evidentiary hearing on the issue, it made no factual findings regarding the alleged conflict of interest issue. On appeal, the OCCA disposed of the claim on

8

the merits:

> Petitioner sets out the following as demonstrating actual conflict of interest:
>
>> 1. Defense counsel Monte Strout's acquiescence in Petitioner's expressed demand that "[a]bove all else, you've got to save Greg."
>> 2. Defense counsel's loyalty to Greg as demonstrated in his argument to sever their trial where he argued that because all the evidence at the preliminary hearing pointed at Petitioner as the shooter, Greg would be unduly prejudiced.
>> 3. The failure to call Greg as a witness in Petitioner's trial to corroborate her testimony for fear it might implicate and discredit him, thereby again demonstrating his loyalty to Greg.
>> 4. Defense counsel's strategy to use the "alibi defense" (that Teresa Baker DeMoss had actually committed the offense) without corroboration from Greg or otherwise, where there was evidence implicating Greg as the "principal actor in the murder."
>
> We have examined the record of the post-conviction proceedings below, considered Petitioner's argument and find that Petitioner has failed to demonstrate that defense counsel's representation amounted to an actual conflict of interest which adversely affected defense counsel's performance.

Smith II, 915 P.2d at 930 (footnotes omitted).

After Smith filed her federal habeas petition, the district court referred the case to the magistrate court to conduct an evidentiary hearing "on the issue of whether Petitioner was advised by counsel of a potential conflict of interest and, if so, whether Petitioner knowingly and voluntarily waived any such conflict." Record Vol. VII, Doc. 62. Strout was the sole witness at the evidentiary hearing. After the hearing, the magistrate issued its report (Id., Vol. VIII, Doc. 89),

9

finding:

> 1. Strout met with Nadine and Greg shortly after their arrest and was informed by both that Nadine "had shot Cindy Baillee and that Greg Smith was in another part of the house with Teresa Baker [DeMoss] when the murder occurred."
>
> 2. Strout advised Smith and Greg "of the possibility of a potential conflict of interest and discussed the possibility of other counsel handling the case."
>
> 3. Smith "was insistent that she wanted Mr. Strout, because she trusted him."
>
> 4. Although Strout believed Smith was concerned for Greg's welfare, he felt she "was honestly relaying what had occurred to him."
>
> 5. Strout stressed "to both [Smith] and her son that, in the event either of their stories changed, they should contact him immediately because other counsel might have to take over the case." Strout "advised [Smith] and her son that if any change occurred in their version of events or, if third party information surfaced which altered their version of events, he would more than likely not be able to represent [Smith] or her son."
>
> 6. Smith "understood that a potential conflict could arise and she understood the potential risks involved."
>
> 7. Smith's "version of events remained consistent at [her] trial concerning the actions of" Greg. Specifically, Smith testified Greg "was in the back room [of Jim Smith's house] listening to the stereo when the shooting occurred."

The district court affirmed the magistrate's findings. In disposing of Smith's habeas petition, the district court concluded:

> After considering Petitioner's allegations, this Court ordered an evidentiary hearing for the sole purpose of ascertaining whether Petitioner was advised of a "potential conflict of interest" and, if so, whether Petitioner waived said conflict. After conducting an evidentiary hearing, the Magistrate Judge found that counsel advised both Petitioner and Greg Smith of the possibility of a potential conflict of interest and discussed the possibility of other counsel handling the case. This Court, after reviewing the transcript from the

10

evidentiary hearing, affirmed the Magistrate Judge's findings and recommendation. Based upon the testimony presented not only at the state court evidentiary hearing, but also at the evidentiary hearing held before the Magistrate Judge, this Court finds that, at the time of Petitioner's trial, an actual conflict of interest did not exist between Petitioner and her son. Accordingly, Petitioner has failed to establish that the decision of the [OCCA] is contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

Id., Vol. IX, Doc. 97 at 24.

The initial question we must address is whether the OCCA erred in concluding that no actual conflict of interest arose out of Strout's representation of both Smith and her son. Shortly after her arrest, Smith contacted Strout and retained him to represent her. Strout was subsequently appointed to represent Greg as well. In their initial meetings, Smith and Greg informed Strout that Smith had in fact killed Baillee and that Greg was in a back bedroom at the time of Baillee's murder. Strout advised Smith and Greg that, as long as their stories remained consistent, he could represent both of them. Strout also advised them, however, that "if any change occurred in their version of events or, if third party information surfaced which altered their version of events, he would more than likely not be able to represent [Smith] or her son." Record Vol. VIII, Doc. 89 at 3. Based upon the information obtained from Smith and Greg, as well as information obtained from the prosecution, Strout concluded there was no conflict of interest. In particular, he believed that his clients generally agreed on the

11

material factual issues, and he concluded that the course of action for each client was compatible with the other. Strout's preferred strategy of defense for Smith was to argue that, at the time of the murder, she was impaired by alcohol and drugs. His strategy of defense for Greg was to argue that he was not responsible for the murder.

At some point prior to her trial (it is unclear from the record precisely when), Smith altered her story. Although she continued to admit that she choked and stabbed Baillee in the car and fired two shots into the recliner where Baillee was sitting, she alleged that DeMoss ultimately shot Baillee. In support of this new version of events, Smith alleged that DeMoss was jealous of Baillee's relationship with Greg. Smith further alleged that DeMoss was high on drugs at the time of the murder. Notwithstanding these alterations in her story, Smith continued to maintain that Greg was not involved in the murder.

At Smith's trial, Strout based his defense strategy upon Smith's "new" version of events. Although the prosecution's evidence was contrary to Smith's "new" version of events, Strout's defense strategy for Smith was to argue that DeMoss had a motive and was responsible for Baillee's murder. Strout's cross-examination of prosecution witnesses focused on highlighting DeMoss' motives and actions, as well as creating doubts regarding Smith's motives and actions. Further, Strout presented the testimony of Smith, who testified consistently with

12

the story she told Strout, except for her refusal at trial to acknowledge that she was under the influence of alcohol and drugs at the time Baillee was murdered.

Notwithstanding Smith's arguments to the contrary, we conclude there was little basis for Strout to investigate or pursue on behalf of Smith a defense strategy that Greg was the "architect" of the murder or that he otherwise "manipulated" Smith into killing Baillee. None of the witnesses who were present in Jim Smith's house prior to or at the time of Baillee's murder testified that Greg was the "architect" or "mastermind" of the murder. Although the prosecution's evidence strongly indicated that Greg was actively involved in the murder,[1] all of the witnesses, except for Smith herself, testified that Smith

---

[1] Viewed in the light most favorable to the prosecution, the evidence presented at trial indicated that Greg: (1) was in possession of the gun as the foursome drove from the motel to Jim Smith's home; (2) told Baillee not to lie to his mother, (3) pulled the gun in the car, pointed it at Baillee, and told Baillee that if she hurt his mother he "would have shot her in a second and not thought anything about it," Tr. at 517-18, (4) pulled a knife out of Baillee's purse while en route and told Smith that Baillee was going to use it to hurt Smith; (5) carried the gun into Jim Smith's house; (6) stated inside Jim Smith's house that Baillee had to be killed; (7) asked Robyn Smith (Jim Smith's wife) to get him a garbage bag for dirty clothes; (8) informed Robyn that Jim would not be involved in killing Baillee; (9) went to the front door of Jim Smith's house when two neighbor men drove up and informed them that Jim Smith was not home (even though he was) to divert attention from what was transpiring inside the house; (10) informed DeMoss that Smith was going to kill Baillee; (11) said to Baillee, in response to her pleas for help, that she deserved to die and "don't beg me, bitch," Tr. at 656; (12) reloaded the gun after Smith fired several shots at Baillee, handed the gun back to Smith, and told her to "finish it off," Tr. at 537-38; (13) assisted in cleaning up blood at the murder scene; (14) discussed with Smith
(continued...)

13

controlled the actions of Baillee and others inside the house. The prosecution bolstered this evidence by introducing a post-arrest note written by Smith to Greg in which Smith directed Greg how to testify regarding the events of the murder.[2] Aside from the lack of evidence to support the "architect" or "manipulation" theory, we are not persuaded that this theory would have absolved Smith of criminal liability for Baillee's murder or altered the outcome of the second stage proceedings. Our review of the trial transcript demonstrates that the jury at Smith's trial was well aware during both the first and second stage proceedings that Greg was actively involved in Baillee's murder and may very well have been an equal participant in her death. Nevertheless, the jury found Smith guilty of first degree murder, found the existence of two aggravating factors, and sentenced her to death for the crime.

Further, we are convinced after examining the record that Smith would have refused to allow Strout to pursue any defense theory on her behalf that placed responsibility for the murder on Greg. Although the legal expert who

_____

[1](...continued)
whether Baillee's body would fit into the trunk of Greg's car; and (15) wiped off the gun with a towel after the murder.

[2] The note began by stating: "Read this over & over [until] you learn what to say. Don't let anyone see you with it. Flush down stool when finished. Throw away." Tr. Exhibit 26. The note essentially directed Greg to tell authorities or testify at trial that DeMoss had a motive for killing Baillee, that DeMoss had been drinking and taking pills prior to the murder, and that DeMoss was the one who shot Baillee and cleaned up after the murder.

14

testified on behalf of Smith in her post-conviction proceedings testified that Strout should have pursued the "architect" or "manipulation" theory notwithstanding Smith's wishes, this testimony is clearly inconsistent with the Supreme Court's view of the attorney-client relationship. In Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 568-69 (1990), the Court noted that "a client controls the significant decisions concerning his representation" and can thus "fire his attorney if he is dissatisfied with his attorney's performance." In light of Smith's consistent statements to Strout prior to trial indicating her desire to protect her son, Smith's own trial testimony, which itself attempted to absolve Greg of responsibility for the crime, and Smith's post-trial statements,[3] we are unwilling to assume that Smith would have allowed Strout to pursue the "architect" or "manipulation" theory. Indeed, the evidence suggests Smith would have fired Strout and retained other counsel had he done so. Cf. Emerson v. Gramley, 91 F.3d 898, 906 (7th Cir. 1996) (concluding that trial counsel's failure to warn criminal defendant of the consequences of standing mute during the sentencing phase of capital trial was constitutionally inadequate "unless it can be said that [the defendant] would have refused to permit argument

---

[3] In an affidavit prepared in February 1985 and submitted in connection with her direct appeal, Smith stated she would not have agreed to testify against Greg in return for a life sentence. See Reply in Support of Direct Appeal, Smith Aff. ¶ 4.

15

or evidence no matter what [trial counsel] . . . had said and done").

We conclude the OCCA reasonably applied <u>Cuyler</u> in resolving Smith's claim that Strout's representation of both Smith and her son presented a conflict of interest. In particular, we agree with the OCCA that no actual conflict of interest arose out of Strout representation of both Smith and her son.[4]

*Prosecution's use of tainted forensic evidence*

Smith contends her right to due process of law was violated by the prosecution's introduction of testimony from Kenneth Ede, a chemist with the Oklahoma State Bureau of Investigation (OSBI). Ede was qualified by the trial court to testify as an expert in the fields of blood and biological tissue analysis, hair analysis, and interpretation of blood spatter evidence. Ede testified, in pertinent part, that he examined a blouse worn by Smith at the time of Baillee's

---

[4] Even assuming, arguendo, that Strout's representation of Smith and Greg resulted in an actual conflict of interest, and further assuming that the "architect" or "manipulation" theory was a plausible alternative defense strategy, Smith has not demonstrated that Strout failed to undertake this alternative defense strategy due to his loyalties to Greg. Strout was deposed in the course of Smith's post-conviction proceeding and he was presented as a witness during the evidentiary hearing conducted by the federal magistrate judge. At no time did he testify that any of the decisions he made in Smith's case were the result of his interest in defending Greg. Indeed, Strout testified that, in his opinion, there was nothing to support the theory that Greg manipulated Smith into killing Baillee. Moreover, Strout testified that, in his opinion, focusing Smith's defense strategy on the role Greg may have played in the murder could conceivably have hurt Smith's defense. In the end, Smith cannot point to any <u>evidence</u> to establish causation.

16

murder and found approximately twenty small blood spatters on the blouse, all of which were the same type as that of Baillee. Ede further testified that he "geometrically interpreted" the blood spatters on the front of the blouse and, based upon that interpretation, concluded that the person wearing the blouse was standing parallel to Baillee at the time she was shot, and in fact was the person responsible for the shooting.

Citing evidence obtained after her direct appeal, including affidavits from qualified experts in the field of blood spatter interpretation, as well as affidavits from OSBI officials regarding Ede and his qualifications, Smith contends that Ede was not qualified to interpret or testify regarding blood spatter evidence, and that his "interpretation" of the blood spatter evidence found on the blouse was "well outside the bounds of science." Smith's Opening Br. at 40. Smith contends this new evidence conclusively demonstrates that, contrary to Ede's trial testimony, the shape of the blood spatters on the blouse "does not permit an expert to conclude who fired the murder weapon."[5] Id.

Smith first presented this general argument and supporting evidence in her application for post-conviction relief. In connection with this argument, Smith

---

[5] Smith also challenges Ede's conclusion that blood found on the back of the blouse was caused by "bleed through" from blood spatters on the front of the blouse. In addition, Smith now asserts that her independent testing of the blouse fails to substantiate that all of the blood spatters found on the blouse contain human blood.

17

asserted: (1) Ede's testimony violated her due process rights because "Ede was an officer and employee of the State of Oklahoma, . . . [and his] conscious testimonial misconduct [wa]s imputable to the State," (2) her due process rights were violated because the introduction of Ede's testimony "falsely bolstered the credibility" of witness Teresa Baker DeMoss, who Smith alleged was an accomplice in the murder, (3) admission of Ede's testimony constituted fundamental error, and (4) the prosecution's failure to provide her with a report of Ede's testimony prior to trial substantially limited her ability to cross-examine Ede and thus deprived her of her due process rights. Smith's Post-Conviction Br. at 19-23. The state district court denied relief and the OCCA affirmed on the following grounds:

> In her first proposition, Petitioner presented, via affidavits, what she asserts is newly discovered evidence which proves that Kenneth Ede, witness for the State, lied about his qualifications as a blood spatter expert, thus presenting a strong challenge to his conclusion that she was the "shooter." This Court recently addressed the issue of Ede's qualification as a blood spatter expert in Clayton v. State, 892 P.2d 646, 652 (Okl. Cr. 1995). There, we found that based on new evidence, Ede did not have sufficient training to qualify him as a blood spatter expert and that he was not qualified to testify on the subject of blood spatter. Thus, we held that the trial court, on application for post-conviction relief, should have determined that admission of Ede's blood spatter testimony was error. We so find in this case.
>     However, as in Clayton, supra, the admission of Ede's erroneous testimony must be subjected to harmless error analysis. After thoroughly reviewing the trial transcript, we determine beyond a reasonable doubt that the jury would still find guilt without using this evidence.

18

Smith II, 915 P.2d at 929.

In her federal habeas petition, Smith reasserted the general issue, arguing that introduction of Ede's testimony at trial violated her right to due process. As she did in state court, Smith asserted that, because Ede was an OSBI agent, his "conscious testimonial misconduct [wa]s imputable to the State." Record Vol. IV, Doc. 19 at 67. However, Smith did not allege in connection with this argument that the prosecution violated her due process rights by failing to timely provide her with a copy of Ede's report. Instead, she asserted this argument in a separate Brady-related argument. The district court rejected Smith's argument, concluding that her due process rights were not violated by the introduction of Ede's testimony.

Smith's claim hinges on the general principle, announced in Napue v. Illinois, 360 U.S. 264, 269 (1959), that the prosecution's knowing use of false evidence violates due process, regardless of whether the evidence goes to a substantive issue or merely to a witness' credibility. To establish a due process violation based upon the introduction of false testimony, Smith must demonstrate that (1) Ede's testimony was false, (2) the prosecution knew Ede's testimony was false, and (3) Ede's testimony was material. See id.

We first address whether Ede's testimony was false. Smith contends, and the State essentially agrees, that Ede overstated his qualifications as a blood

19

spatter expert in certain regards. For example, Ede testified at trial that he took a week-long course in blood spatter analysis from Dr. Herbert MacDonnell, one of the leading authorities in the discipline. Ede's testimony is refuted, however, in a post-trial affidavit from Dr. MacDonnell, which indicates that the course was only three days in length and was insufficient to prepare Ede to provide expert testimony in a court of law. We thus accept Smith's assertion that Ede's testimony regarding this specific aspect of his training and qualifications was false for purposes of analysis under Napue.

Smith also contends, and the State does not dispute, that many of Ede's explanations of blood spatter analysis in general and most of his specific conclusions were scientifically inaccurate. For example, the post-trial evidence gathered by Smith suggests it is scientifically impossible to conclude that the person wearing the blouse fired numerous shots at Baillee. What remains unclear, however, is whether these scientific inaccuracies were the result of negligence, recklessness, or intentional misconduct on the part of Ede. Because there is a dearth of case law applying Napue in the context of allegedly false expert testimony, we will assume, without deciding, that the scientific inaccuracies established by Smith qualify as "false" statements for purposes of Napue.[6]

---

[6] Although there would seem to be little doubt that scientifically inaccurate testimony resulting from recklessness or intentional misconduct would qualify as

(continued...)

20

We next turn to the question of whether the prosecution knew Ede's testimony was false. The only argument Smith makes in this regard is that, because Ede was an OSBI agent, his knowing decision to provide inaccurate testimony should be imputed to the prosecution. We are unable to accept this argument for two reasons. First, there has been no factual finding by the state courts or the district court that Ede knowingly provided scientifically inaccurate testimony. Second, even assuming that Ede acted knowingly, Supreme Court precedent does not clearly establish that Ede's knowledge should be imputed to the prosecution for purposes of Napue. Indeed, the Supreme Court has not directly addressed the issue, see Briscoe v. LaHue, 460 U.S. 325, 326 n.1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer

---

[6](...continued)
"false" for purposes of Napue, see In re Investigation of the West Virginia State Police Crime Lab., 438 S.E. 2d 501, 503 (W.Va. 1993) (concluding, based upon written results of five-month long investigation conducted by retired judge, that former state serologist knowingly falsified evidence in numerous criminal prosecutions), it is conceivable, though far from certain, that scientifically inaccurate testimony resulting from mere negligence might be treated differently. See generally Mooney v. Holohan, 294 U.S. 103, 112 (1935) (holding that due process prohibits prosecution's knowing use of perjured testimony); Black's Law Dictionary 600 (6th ed. 1990) (indicating that the term "false" can be construed with or without a knowledge component). In other words, it is conceivable that, for scientifically inaccurate expert testimony to be construed as "false" for purposes of Napue, it must be demonstrated that the expert knew or should have known his testimony was untrue.

21

in itself violates constitutional rights."), and there appears to be a split of opinion among the circuits on the issue. Although the Fourth Circuit has held that "knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution" for purposes of determining whether there has been a Napue violation, Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998), cert. denied, 525 U.S. 1150 (1999), this court and the Fifth Circuit have refused to impute the knowledge of a law enforcement officer to the prosecution where there has been an alleged Napue violation. See Smith v. Sec'y of New Mexico Dep't of Corrections, 50 F.3d 801, 831 (10th Cir. 1995) (concluding that a Napue violation was avoided because, even though state investigative employee was aware of false testimony, prosecution did not have actual knowledge of false testimony); Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990). We are therefore unable to conclude that the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

*Prosecution's failure to disclose exculpatory evidence*

Smith contends the prosecution violated her due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose exculpatory evidence that would have allowed her to impeach eyewitness DeMoss and expert witness Ede. In Brady, the Supreme Court held that "the suppression by the prosecution of

22

evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The materiality requirement is satisfied only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" and, accordingly, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

*DeMoss* -- Smith's argument concerning the suppression of evidence pertaining to DeMoss is two-fold. First, Smith contends the prosecution failed to disclose the fact that DeMoss was promised immunity from prosecution in return for her testimony. Second, Smith contends the prosecution failed to disclose the existence of a tape-recorded statement DeMoss gave to the police and assistant district attorney Donn Baker prior to trial. According to Smith, the tape-recorded statement may have revealed the existence of a deal between DeMoss and Baker. Further, Smith contends there were discrepancies between the tape-recorded statement and DeMoss' trial testimony that would have provided Smith with

23

impeachment opportunities.[7]

Smith's claim that the prosecution failed to disclose the existence of an immunity deal with DeMoss is procedurally barred. As the State correctly points out, the issue was not raised in Smith's direct appeal or in her application for post-conviction relief.[8] Because "Oklahoma would bar consideration of this precise claim on an independent and adequate state law procedural ground if [Smith] presented it in a second post-conviction application," the claim is barred for purposes of federal habeas review in the absence of a showing of cause and prejudice. Clayton v. Gibson, 199 F.3d 1162, 1174 (10th Cir. 1999), cert. denied, 121 S. Ct. 100 (2000).

In an effort to establish cause, Smith suggests that the factual bases for the claim were not available to her until shortly before the time she filed her reply

---

[7] According to Smith, DeMoss' tape-recorded statement differs from her trial testimony in the following respects: (1) DeMoss opined on tape that Smith was "not in her right mind" during the incident; (2) DeMoss made no mention on tape of the fact that Smith put on black gloves before choking Baillee in the car; (3) DeMoss made no mention on tape of Smith laughing as she stomped on Baillee's neck; (4) DeMoss admitted on tape that she heard a threat to Greg's life; and (5) DeMoss conceded on tape that rumors of a fight between her and Baillee were circulating.

[8] The claim was asserted for the first time in Smith's reply brief in support of her federal habeas petition. To support the claim, Smith attached an affidavit from former assistant district attorney Donn Baker, which itself was not obtained until November 25, 1997, approximately one month before Smith filed her reply brief.

24

brief in federal court.[9]  In particular, Smith alleges that "[t]he confirmation [of an immunity deal with DeMoss] by Mr. Baker under oath in his affidavit of November 25, 1997, was the first evidence that [she] had to support" her claim. Petitioner's Suppl. Information at 2.  What Smith ignores, however, is that the existence of an immunity deal with DeMoss was officially disclosed on the record in her state criminal proceedings on December 29, 1982.  Further, DeMoss was questioned by Strout about the grant of immunity during Greg's trial in June 1983.  Based upon these uncontroverted facts, we fail to understand how Smith was externally impeded from investigating the circumstances of the grant of immunity or asserting the claim in her state court proceedings.  We therefore conclude Smith cannot establish cause for failing to assert the claim in state court.[10]

Smith's claim regarding suppression of DeMoss' tape-recorded statement was first presented to the Oklahoma courts in the context of her application for

---

[9]  Smith also contends the procedural default defense has been waived by respondent because the district court reviewed the claim on the merits and respondent did not file a cross-appeal.  This contention is precluded by our opinion in  Jones v. Gibson , 206 F.3d 946, 955 n.4 (10th Cir. 2000).  Moreover, we note respondent did not have an opportunity to assert the procedural default defense in district court because Smith first asserted the claim in her reply brief.

[10]  To the extent that Smith is asserting the prosecution violated        Napue  by knowingly allowing DeMoss to falsely testify at the preliminary hearing that she had not been promised immunity from prosecution in return for her testimony against Smith, that claim is procedurally barred for the same reasons.

25

post-conviction relief.  The OCCA treated it as an ineffective assistance of appellate counsel claim and concluded:

> We have reviewed the particulars of the DeMoss interview as set forth in Petitioner's brief and do not find them to be exculpatory. While some of the particulars may be used for impeachment, we do not believe that DeMoss' credibility was material to Petitioner's guilt or sentence due to sufficient corroboration of her testimony. Additionally, we note that Petitioner claims that the State continues to fail to provide her with the tape.  However, defense counsel in his deposition unequivocally states, "I did ultimately get it . . . ." (Citation omitted.)  We find no merit in this claim.

Smith II, 915 P.2d at 930-31.

Although Smith asks us to review the alleged suppression of DeMoss' tape-recorded statement on the merits, we are precluded from doing so because the claim was construed and analyzed by the OCCA as an ineffective assistance of appellate counsel claim.  We therefore treat the claim in the same manner. Ineffective assistance of appellate counsel claims are governed by Strickland.  To establish constitutionally ineffective assistance of counsel, Smith must show both that her appellate counsel's performance was deficient and that the deficient performance prejudiced her defense.  See 466 U.S. at 687.  "This court's review of counsel's decision to omit an issue on appeal is highly deferential."  Moore v. Gibson, 195 F.3d 1152, 1180 (10th Cir. 1999), cert. denied, 120 S. Ct. 2206 (2000).  "An appellate counsel's performance may be deficient and may prejudice the defendant only if counsel fails to argue a 'dead-bang winner,'" which is

26

generally defined as an issue which is obvious from the record and which would have resulted in reversal on appeal. Id.

The key question is whether the Brady claim based on the prosecution's alleged suppression of DeMoss' tape-recorded statement was a dead-bang winner. The OCCA essentially concluded it was not, noting that "[w]hile some of the particulars [contained in the tape-recorded statement] may [have] be[en] used for impeachment, we do not believe that DeMoss' credibility was material to Petitioner's guilt or sentence due to sufficient corroboration of her testimony." Smith II, 915 P.2d at 930. In our view, this conclusion represents a reasonable application of Brady. Although DeMoss was a damaging witness to Smith in that she was the only witness who testified that she actually observed Smith shoot Baillee, her testimony regarding what transpired on the morning of Baillee's murder was corroborated in many important respects by other witnesses. Smith herself admitted choking and stabbing Baillee in the backseat of the car on the way to Jim Smith's house and further admitted shooting two shots into the recliner where Baillee was sitting. Both Jim and Robyn Smith corroborated DeMoss' testimony that Smith was in control of the situation inside the house. For example, Robyn Smith testified that as Smith entered the house behind Baillee, Smith said to Baillee: "[Y]ou can tell my husband, his wife and me whatever you want but it is too late, you are going to die." Tr. at 373. Robyn

27

Smith testified that Smith subsequently stated that Baillee was going to "die slow," and that she "was going to suffer." Id. at 385. Robyn Smith also testified that (1) Smith instructed DeMoss to go outside to the car and get clean clothes for Baillee; (2) DeMoss gave instructions to no one; (3) she did not hear DeMoss and Baillee argue; and (4) she did not see DeMoss in possession of the gun. Finally, a review of the transcript of DeMoss' tape-recorded statement indicates that it was highly consistent with her trial testimony. Although Smith has pointed out the few inconsistencies, it is arguable that introduction of the statement at trial would have been more damaging than helpful to Smith.

In a final related argument, Smith asserts she was not provided with a full transcript of the tape-recorded statement, which, she contends, may have revealed the existence of an immunity deal between the prosecution and DeMoss. Although Smith argued in her application for post-conviction relief that she was provided with an incomplete transcript, she never asserted that the "missing" portions of the transcript may have revealed the existence of an immunity deal. Thus, the argument appears to be procedurally barred. Even assuming it is not procedurally barred, we are persuaded it has no merit. In support of her argument, Smith correctly notes that the transcript of the tape-recorded statement does not appear to contain the entire discussion between DeMoss and assistant

28

district attorney Baker.[11]  From this fact, however, Smith makes three unsupported leaps in logic.  First, she assumes that the entire discussion was initially transcribed in its entirety.  Second, she assumes that portions of the transcript were subsequently redacted by the prosecution prior to a copy of the transcript being turned over to her.  Finally, she assumes that the redacted portions contained exculpatory information including, potentially, information concerning an immunity deal between Baker and DeMoss.

We are unwilling to accept any of these assumptions.  Although Smith complained in her application for post-conviction relief that she did not receive a complete transcript, Smith did not attempt to introduce during the evidentiary hearing on her application any evidence concerning the tape-recorded statement.  Thus, the state district court had no basis for making any findings of fact concerning what was discussed during the interview between Baker and DeMoss, whether the entire interview was initially transcribed, or whether any redactions were made by the prosecution prior to production of the transcript to Smith.  Further, because of Smith's failure to develop the factual basis of this claim in her state court proceedings, she is not entitled to an evidentiary hearing in federal

---

[11]  Several factors support this conclusion: (1) the transcript begins with an answer from DeMoss rather than a question from Baker; (2) the initial answer from DeMoss begins in the middle of her description of the events leading to the homicide; and (3) the transcript ends with a question from Baker.

court on the issue and, in any event, the record on appeal in this federal habeas proceeding is void of evidence to support Smith's assumptions regarding the transcript. See 28 U.S.C. § 2254(e)(2) (providing that "if the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim").

*Ede* -- Smith contends the prosecution violated Brady by failing to provide her with a copy of Ede's report prior to trial and by failing to inform her of Ede's lack of qualifications to perform blood spatter analysis. These claims were first asserted by Smith in her application for post-conviction relief. Although the OCCA affirmed the state district court's denial of post-conviction relief, it did not specifically address these claims.

We first address the alleged pretrial suppression of Ede's report. In a deposition taken in connection with Smith's application for post-conviction relief, defense counsel Strout testified that, "[t]o the best of [his] knowledge, [he] never received any such thing [i.e., Ede's report]." Reconstructed Postconviction Exh. 6 at 9. Strout acknowledged, however, that he was provided the opportunity to go through the district attorney's technical reports and files prior to trial. Based upon this limited evidence, the district court concluded, and we agree, that Strout's "inability to remember whether he received this report does not establish that the State actually withheld the report." Record Vol. IX, Doc. 97 at 35.

30

Even assuming the prosecution suppressed Ede's report, it is far from clear that the report was favorable to Smith or material to her guilt or punishment. Although the record on appeal does not contain a copy of Ede's report, the report presumably parroted the testimony Ede gave at trial. Assuming this is correct, there was little in it that could have been considered exculpatory or favorable to Smith. Instead, the report would have been highly damaging to Smith. As for materiality, Ede testified at Smith's preliminary hearing in August 1982 (approximately four months prior to trial), and provided his analysis and opinions regarding the blood spatter evidence. Even absent Ede's report, Smith and her counsel were well aware that Ede was going to testify regarding the blood spatter evidence. Indeed, defense counsel testified in connection with the application for post-conviction relief that he used Ede's preliminary hearing testimony to prepare to cross-examine Ede at trial. Thus, we are not persuaded there is a reasonable probability that, had the prosecution provided Ede's report to Smith and her counsel, the results of either stage of trial would have been different.

We next turn to Smith's assertion that the prosecution suppressed evidence that Ede was unqualified to perform blood spatter analysis. Although the post-conviction evidence gathered by Smith persuasively indicates that Ede was unqualified to perform blood spatter analysis, Smith has produced virtually no evidence indicating that the prosecution was aware of this problem prior to or

31

during trial. Likewise, Smith has failed to demonstrate whether Ede acted negligently, recklessly, or knowingly in holding himself out as an expert in the field of blood spatter analysis. Thus, Smith has failed to demonstrate that the prosecution suppressed any information in this regard. Even assuming that such evidence was suppressed, we are not persuaded that Smith can satisfy Brady's materiality requirement. Specifically, given the wealth of evidence pointing to Smith's guilt, we are not persuaded that, had evidence of Ede's lack of qualifications been disclosed to the defense, the outcome of the trial would have been different.

*Ineffective assistance of trial counsel - failure to investigate and prepare*

Smith contends her trial counsel was ineffective for failing to adequately investigate and prepare for the first and second stages of trial. More specifically, Smith contends her trial counsel failed (1) to adequately investigate and prepare to counter the testimony of Ede during the first stage of trial, and (2) to investigate, develop and present "meaningful" second-stage mitigation evidence, including evidence that she was of below-average intelligence, suffered from an organic brain injury, and was impaired by intoxicants and lack of sleep at the time

of the murder.[12]

Smith's claims of ineffective assistance are governed by the two-part test announced in Strickland. Under that test, Smith must demonstrate that (1) defense counsel's performance was constitutionally deficient (i.e., it fell below an objective standard of reasonableness), and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. 466 U.S. at 688.

Smith first asserted an ineffective assistance of counsel claim in her direct appeal. She claimed trial counsel was ineffective for failing to introduce during the second stage proceedings evidence that (1) Smith was a first-time offender, and (2) Smith "was drinking alcohol and had gone without sleep for approximately twenty-four hours prior to the homicide." Smith's Direct Appeal Br. at 59. The OCCA rejected this claim, concluding as follows:

> The appellant . . . contends that she received ineffective assistance of counsel, alleging that trial counsel failed to introduce two mitigating circumstances. The test is "Whether counsel's conduct so undermined the proper functioning of the adversarial

---

[12] Smith also contends her trial counsel was ineffective for failing to gather and present evidence to support the theory that Greg was the "architect" of Baillee's murder. This contention was not presented to the Oklahoma state courts. Because the issue would be procedurally barred if raised in a second application for post-conviction relief, it is likewise procedurally barred for purposes of federal habeas review, and Smith has failed to establish cause and prejudice or actual innocence to excuse her failure to assert it either on direct appeal or in her first application for post-conviction relief.

process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed.2d 674, 692-93 (1984). The proper standard as set forth in that case is "reasonably effective assistance." It further speaks of the necessity of a reviewing court indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In the case before us the two circumstances which the appellant complains were not introduced, were brought out during the first stage of trial. The fact that defense counsel did not rehash this evidence during the second stage is not sufficient to make defense counsel's assistance ineffective. This assignment of error is utterly meritless.

Smith I, 727 P.2d at 1372.

In her application for post-conviction relief, Smith asserted her appellate counsel was ineffective for failing to assert on direct appeal additional claims of ineffective assistance of trial counsel. In particular, she alleged that appellate counsel should have alleged on direct appeal that trial counsel was ineffective for failing to (1) adequately investigate and prepare to defend against the testimony of Ede, (2) investigate and prepare mitigation evidence for the second-stage proceedings, and (3) move for a change of venue due to extensive pretrial publicity. The OCCA rejected these claims:

We next address Petitioner's claim of failure of defense counsel to adequately investigate. Based on defense counsel's deposition in this case, we find that his decision for the limited investigation was based on the informed strategic choices made by Petitioner and on information supplied by Petitioner. As such, his actions were not unreasonable.

34

Having examined each of the claims of ineffective assistance of counsel, individually and in the aggregate, we conclude that no relief is warranted. To prevail on an ineffective assistance of counsel claim, Petitioner must show that counsel's performance was deficient and that such deficient performance prejudiced her. Petitioner must show a reasonable probability that, but for her appellate counsel's unprofessional errors, the result of her appeal would have been different. Accordingly, we find that Petitioner's appellate counsel was not ineffective in failing to adequately or otherwise raise these issues.

Smith II, 915 P.2d at 931 (internal citations omitted).

Smith now asserts that the OCCA "considered these extra-record issues [i.e., trial counsel's alleged failures] on the merits when they were presented on postconviction." Smith's Opening Br. at 75. Curiously, both the district court and the respondent accepted this assertion and addressed the issues of ineffective assistance of trial counsel on the merits. A review of the state court records, however, demonstrates that Smith's assertion is false. As outlined above, Smith raised all of these issues (except that trial counsel should have presented second stage evidence that she was under the influence of intoxicants and lack of sleep at the time of the murder) in the context of an ineffective assistance of appellate counsel claim, and the OCCA treated them as such. We are therefore bound to do the same.[13] Cf. United States v. Espinoza-Saenz, 2000 WL 1838292 *3 (10th Cir.

---

[13] Clearly, Smith could have directly asserted her claims of ineffective assistance of trial counsel in her application for post-conviction relief (rather than asserting them under the guise of ineffective assistance of appellate counsel).

(continued...)

35

2000) (holding that a federal prisoner seeking post-conviction relief was confined to claims asserted in original motion for post-conviction relief and that claims asserted in supplemental motions for post-conviction relief could not be considered because they were separate in time and type from those alleged in the original motion). Accordingly, these issues will be addressed in the context of Smith's ineffective assistance of appellate counsel claim.

The only remaining question with regard to Smith's ineffective assistance of trial counsel claim is whether the OCCA erred in rejecting Smith's assertion on direct appeal that her trial counsel was ineffective for failing to present second-stage evidence that Smith was impaired by intoxicants and lack of sleep at the time of the murder. As previously noted, the OCCA rejected this claim as "utterly meritless," noting that this evidence was "brought out during the first stage of trial." Smith I, 727 P.2d at 1372. Based upon a review of the record on appeal, we are persuaded the OCCA reasonably applied the standards of Strickland in reaching this conclusion. As the OCCA correctly noted, there was abundant evidence presented during the first stage of trial that Smith had been awake all night prior to the murder (Smith testified that she and her fiancé had spent the

---

[13](...continued)
Had she done so, the OCCA may have rejected the claims as procedurally defaulted under Oklahoma state law since they were not raised on direct appeal. Even had the OCCA done so, however, we would likely have reviewed the claims on the merits.

night socializing at her fiancé's sister's house) and had consumed beer (Smith admitted to drinking beer on the night prior to the murder) and pills (DeMoss testified that Smith took several pills on the morning of the murder). The jury was clearly aware of this evidence during its second-stage deliberations and there appears to have been little, if any, prejudice resulting from defense counsel's failure to again emphasize this evidence during the second-stage proceedings. Moreover, defense counsel subsequently testified during the course of the post-conviction proceedings that he did not focus on this evidence because Smith "did not want to openly admit about being that much under the influence of drugs and alcohol," Reconstructed Postconviction Exh. 6 at 40, since her mother and father would be observing the trial proceedings. In other words, defense counsel's second-stage strategy was shaped by Smith's own decision not to emphasize her intoxication and her surprise decision on the witness stand to deny ingesting pills on the morning of the murder. See id. at 61 (defense counsel testified that he was "surprised" when Smith testified at trial that she had not used pills). We agree with the OCCA that defense counsel's decision was proper under the circumstances and, even assuming defense counsel was ineffective for failing to emphasize Smith's alcohol and drug use during the second-stage proceedings, Smith was not prejudiced.

37

*Ineffective assistance of appellate counsel*

Smith contends her appellate counsel was ineffective for failing to assert on direct appeal: (1) the prosecution's failure to disclose the tape-recorded statement from DeMoss (2) the conflict of interest issue; and (3) ineffectiveness of trial counsel for failing to investigate and prepare to counter Ede's testimony, and for failing to investigate, prepare and present additional mitigation evidence during the second-stage proceedings.

Smith's contention that her appellate counsel was ineffective for failing to address on appeal the prosecution's failure to disclose the tape-recorded statement of DeMoss has been analyzed above. For the reasons previously stated, we find no merit to the issue.

As for the conflict of interest issue, Smith's appellate counsel asserted a "potential conflict of interest" issue on direct appeal, and Smith (represented by different counsel) asserted an "actual conflict of interest" argument in her application for post-conviction relief. Both of these arguments were rejected on the merits by the OCCA. Appellate counsel's failure to assert the "actual conflict of interest" issue on direct appeal did not deprive Smith of the opportunity to have that issue addressed on the merits by the Oklahoma state courts. In any event, for the reasons outlined above, we agree with the OCCA that Smith failed to demonstrate the existence of an actual conflict of interest. The issue was not a

38

"deadbang winner," and Smith's appellate counsel was not ineffective for failing to assert it on direct appeal.

With respect to trial counsel's alleged failure to prepare for Ede's testimony, the OCCA rejected Smith's contention that her appellate counsel was ineffective for failing to raise this issue. In particular, the OCCA concluded that trial counsel's efforts in this regard were influenced by Smith's own statements to counsel: "Based on defense counsel's deposition in this case, we find that his decision for the limited investigation was based on informed strategic choices made by Petitioner and on information supplied by Petitioner. As such, his actions were not unreasonable." Smith II, 915 P.2d at 931. The question for us is whether the OCCA reasonably applied Strickland in rejecting this ineffective assistance of appellate counsel claim.

Smith's trial counsel, Monte Strout, was deposed in connection with Smith's application for post-conviction relief. Strout testified that Smith repeatedly informed him that she had, in fact, shot Baillee. Based upon Smith's statements to him, as well as upon his review of the prosecution's evidence, Strout initially envisioned mounting a defense for Smith based upon diminished capacity due to alcohol and drug intoxication. At some point prior to trial, however, Smith altered her story. Instead of admitting to the murder, Smith alleged that DeMoss was responsible for shooting Baillee.

39

Once Smith changed her story and denied shooting Baillee, Strout necessarily had to find a way to challenge Ede's testimony. Strout testified that, based on Ede's preliminary hearing testimony, he "knew how [Ede] was going to testify generally," and "thought it was an incredible theory that [he] could not imagine reasonable people accepting." Reconstructed Postconviction Exhibit 6 at 12. Strout further testified that, in preparing for trial, he "went over the [preliminary hearing] transcript" and "tried to find just . . . simple reasons and examples of why [Ede's] theory [that the person wearing the blouse had to have been shooter] could not be correct as he had given it . . . because it had no limitations and no variations." Id. at 13. Strout admitted he was unfamiliar with blood spatter analysis, and did not know any other experts in the field. He testified that a report from an independent expert in blood spatter analysis would "absolutely" have been helpful to the defense, but that he and Smith lacked the funds to hire such an expert, and he did not think the trial court "would entertain a blood spatter expert request" in a case involving retained defense counsel. Id. at 15.

During the first stage of trial, Strout attempted to persuade the jury that DeMoss was responsible for the shooting. In doing so, Strout spent a considerable amount of time cross-examining Ede and attempting to expose flaws in his blood spatter analysis. Strout did not, however, cross-examine Ede using

concepts from any books or articles on the subject of blood spatter analysis, nor did Strout present his own expert on the subject.

It is a close question whether Strout's performance in preparing for Ede's testimony was constitutionally adequate. As the OCCA seems to have concluded, Strout's trial preparation efforts were shaped by the information conveyed to him by Smith. In particular, Smith's initial admission to the charged crime obviously lessened Strout's interest in aggressively pursuing and challenging Ede's testimony. When Smith changed her story, Strout responded by examining Ede's preliminary hearing testimony and developing questions for cross-examination. Although Strout also considered the possibility of hiring an independent expert, he and Smith lacked funds to do so, and he appears to have reasonably concluded that the trial court would not appoint an expert in a case involving retained counsel. Thus, the main flaw in Strout's preparation appears to have been his failure to more thoroughly prepare himself for cross-examination of Ede by obtaining and reviewing available books or treatises on the subject of blood spatter analysis. Again, however, Strout's failure in this respect appears to have been shaped by Smith's changing stories. Although the record does not reveal precisely when Smith changed her story and denied shooting Baillee, it appears to have occurred relatively close to the time of trial. Assuming this is the case, Strout would have been left with little time to obtain, digest, and make use of any

41

such books or treatises.

Assuming for purposes of argument that Strout's preparation for Ede was constitutionally deficient and that the OCCA erred in deciding otherwise, the remaining question is whether there is a reasonable probability that, but for Strout's failure, the outcome of the proceedings would have been different. The OCCA did not reach this issue, so we are free to review it de novo. An examination of the trial transcript indicates that Strout spent a considerable amount of time cross-examining Ede regarding his analysis and conclusions. Strout's cross-examination of Ede extends over approximately forty-seven pages of the trial transcript. Although Ede maintained on cross-examination that the person wearing the blouse was more than likely the shooter, he admitted to Strout that it was possible the person wearing the blouse could have received the blood spatters simply by being in the proximity of the shooting. In short, Strout was able to expose some weakness in Ede's theory.[14]

Assuming that additional preparation by Strout would have allowed him to discredit Ede, we are not persuaded that the outcome of either the first- or second-stage proceedings would have been different. As previously discussed, DeMoss

---

[14] The state district court, in disposing of Smith's application for post-conviction relief, concluded that "the credibility of Mr. Ede was questioned by Mr. Strout through a very thorough cross-examination." Order Denying Application for Post Conviction Relief, at 5.

42

testified regarding the details of Baillee's murder, including the fact that Smith shot Baillee multiple times in the head and chest, and DeMoss' testimony was corroborated in many respects by other witnesses who were present in Jim Smith's house. In light of this evidence, we are persuaded that Smith would have been convicted and sentenced to death even absent Ede's testimony.

Smith's last contention is that her appellate counsel was ineffective for failing to challenge trial counsel's efforts in preparing second-stage mitigation evidence. The OCCA rejected this argument, concluding that Strout's mitigation efforts were "based on informed strategic choices made by [Smith] and on information supplied by [Smith]." Smith II, 915 P.2d at 931. Again, the question for us is whether this represents a reasonable application of the standards announced in Strickland.

In deciding this question, it is helpful to review the events that transpired during the second-stage proceedings. At the outset, the prosecution alleged the existence of three aggravating factors: (1) the murder was especially heinous, atrocious or cruel; (2) the existence of a probability that Smith would commit acts of violence and would constitute a continuing threat to society; and (3) that Smith knowingly created a great risk of death to more than one person.[15] In support of

---

[15] The prosecution had initially alleged the existence of a fourth aggravating factor: that the murder was committed for the purpose of avoiding or
(continued...)

43

these alleged aggravating factors, the government incorporated the first-stage evidence and presented additional testimony from DeMoss and Jim Smith. DeMoss testified that before Smith starting choking Baillee in the car, Smith put on black gloves and told Baillee that she would never see Cherokee County again. DeMoss further testified that Smith choked Baillee for approximately two to three minutes, causing Baillee's eyes to "roll up into her head." Tr. at 1270. After the choking incident, DeMoss testified, Smith stabbed Baillee in the throat with a knife. According to DeMoss, Smith twisted the knife in Baillee's throat before pulling it out. DeMoss testified that Smith fired two or three shots into Baillee's body before asking Greg to reload the gun. While Greg reloaded the gun, DeMoss testified, Smith stepped on Baillee's neck and started bouncing up and down and laughing. Jim Smith testified that he had been married to Smith for approximately seventeen or eighteen years, and that in 1965, Smith shot him with a .25 caliber gun while the two were drinking and arguing. On cross-examination, Jim Smith admitted that he had abused Smith during the course of their marriage (and in fact broke her leg on two occasions), and had a restraining order against him at the time Smith shot him. Id. at 1284-85.

---

[15](...continued)
preventing a lawful arrest. At the beginning of the second-stage proceedings, the trial court allowed the government to strike this allegation from its bill of particulars.

Smith presented eight mitigation witnesses. Jim Smith testified that Smith did not intentionally shoot him in 1965 but that the gun went off during a struggle. Smith herself testified that she had two brothers, that her father was a plumber/electrician and preacher, and that her mother was a housewife. She testified about her marriage to Jim Smith, recounting that he was a heavy drinker, had beat her, and was mean to their children. Smith detailed her steady history of employment and testified that she had regularly attended church during her lifetime. Three of Smith's children, as well as one of her daughters-in-law, testified that Smith was a good mother and grandmother. Sequoyah County Sheriff Sam Lockhart testified that Smith had been a model prisoner since the time of her arrest on the murder charges. DeMoss testified that she lived with Smith for a brief period of time. DeMoss testified on cross-examination, however, that during that time she was not allowed to eat meals with Smith and her family.

At the conclusion of the evidence, Smith demurred to the prosecution's bill of particulars. The trial court overruled the demurrer as to the "heinous, atrocious or cruel" aggravator and the "creation of risk or danger to others" aggravator, but sustained the demurrer as to the continuing threat aggravator. Id. at 1315. In its instructions to the jury, the trial court indicated that the mitigating circumstances alleged by Smith included the following:

45

(1) defendant is a good, loving mother to her children and it has been left up to her completely to raise and provide for them; (2) the extent of her education consists of public schools and business college; (3) defendant has held steady employment during most of her adult life; (4) defendant during her adolescent years was active in Sunday School and church and during the early part of her adult years was active in Sunday School and church and played the piano to accompany the choir; (5) during the years of marriage to James Hork Smith while she was raising and providing for the children she was beaten at the hands of her alcoholic husband and in fact suffered a broken leg as a result thereof; (6) she was responsible for the children's involvement in church; (7) since her incarceration she has been a model prisoner.

Id. at 1324-25 . The jury found the existence of both aggravating factors (that the murder was heinous, atrocious or cruel, and that Smith created a great risk of death to more than one person) and fixed Smith's punishment at death.

In her application for post-conviction relief, Smith contended that Strout should have discovered the fact that she was involved in a serious car accident in 1966 that rendered her unconscious for a time and resulted in organic brain damage. According to a post-conviction psychological examination obtained by Smith, this organic brain damage, particularly when combined with drugs and alcohol, substantially impaired her ability to control violent impulses. Strout testified in the post-conviction proceedings that he obtained a variety of personal information from Smith prior to trial, but that the "only major injury she ever shared with [him]" was an incident during her marriage to Jim Smith "where he broke her arm or leg or something." Reconstructed Postconviction Exhibit 6 at

37. According to Strout, Smith never mentioned anything about the 1966 car accident or the resulting closed head injury. As for other medical information, Strout asked Smith whether she was on any medications (she said she was not) but he did not obtain Smith's medical records. Although Strout considered the possibility of having a psychologist examine Smith, he ultimately concluded there was no basis for doing so. In particular, Strout concluded that Smith "was perfectly lucid," "had a good memory," and was simply under the influence of drugs and alcohol at the time of the murder. Id. As for Smith's drug and alcohol use, Strout testified he was surprised during the first stage of trial when Smith denied being under the influence of drugs and alcohol at the time of the murder. According to Strout, in his opinion, Smith did not "want her parents to hear evidence about her taking drugs and drinking." Id. at 35.

We find it unnecessary to decide whether Strout's second-stage preparation and presentation were constitutionally deficient because, even assuming they were, the outcome of the second-stage proceedings was not reasonably affected. Although the evidence pertaining to Smith's organic brain damage would have been proper mitigating evidence and may have helped explain the crime to some degree, it would not, in our view, have altered the jury's findings that the crime was especially heinous, atrocious or cruel, and that Smith created a great risk of death to more than one person. Moreover, we are not persuaded it is reasonably

47

probable that the introduction of the organic brain damage evidence would have led the jury to choose a life sentence rather than a death sentence. See, e.g., Smith v. Gibson, 197 F.3d 454, 463 (10th Cir. 1999) (concluding that introduction of evidence of defendant's low I.Q. and/or defendant's organic brain damage did not outweigh multiple aggravating circumstances "in light of the strength of the evidence supporting the aggravating circumstances, the nature of the crime and the limited mitigating effect of this psychiatric evidence."), cert. denied, 121 S. Ct. 102 (2000).

*OCCA's reweighing of "especially heinous, atrocious or cruel" aggravator*

After Smith's conviction and sentence became final, the Supreme Court struck down Oklahoma's "especially heinous, atrocious or cruel" aggravating circumstance as vague and overly broad. See Maynard v. Cartwright, 486 U.S. 356, 363-64 (1988). The OCCA narrowed the aggravator, holding that it applies only to those murders which are preceded by torture or serious physical abuse. See Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987) (responding to Tenth Circuit's decision in Maynard striking down "especially heinous, atrocious or cruel" aggravator). In her application for post-conviction relief, Smith, relying on Maynard, challenged the constitutionality of the trial court's jury instruction regarding the "especially heinous, atrocious or cruel" aggravating circumstance.

The state district court proceeded to reexamine the evidence under the narrowing construction announced in Stouffer, and concluded it was sufficient to support the aggravator. On appeal, the OCCA agreed:

> Based on the facts as set forth in Smith v. State, 727 P.2d at 1368, Petitioner was wholly indifferent to the pain inflicted upon the victim. While traveling to the home of James Smith, Petitioner choked the victim, Cindy Bailee, and stabbed her in the throat with a knife. While at the Smith house, Petitioner forced Ms. Bailee to sit in a recliner chair, threatened to kill her and taunted her with a pistol. Petitioner fired a shot into the recliner near Ms. Bailee's head. She then fired a series of shots at Ms. Bailee who subsequently fell to the floor. As Greg Smith reloaded the pistol, Petitioner laughed while jumping on Ms. Bailee's neck.
> Petitioner also took the pistol from Greg and fired four more bullets into the body. A subsequent autopsy showed Ms. Bailee had been shot five times in the chest, twice in the head, and once in the back. Five of these gunshot wounds were potentially fatal. The knife wound was also potentially fatal. Thus, it is clear that Petitioner's acts may be characterized as especially heinous, atrocious or cruel under the narrowing instruction. We therefore affirm the heinous, atrocious or cruel aggravating circumstance.

Smith II, 915 P.2d at 931.

In her federal habeas petition, Smith attacks two aspects of the OCCA's decision. First, she contends the OCCA erred because it neither reweighed the valid aggravating factors against the mitigating evidence nor determined if the effect of the invalid aggravator was harmless beyond a reasonable doubt as required by Clemons v. Mississippi, 494 U.S. 738 (1990). Second, she contends the OCCA erred in applying a "sufficiency of the evidence" standard rather than determining whether the evidence supported the aggravator beyond a reasonable

49

doubt.

As Smith acknowledges in her appellate brief, her first argument is foreclosed by our decision in Jones v. Gibson, 206 F.3d 946 (10th Cir. 2000). There, we noted that Clemons "provides for reweighing of the remaining valid aggravators and mitigators or harmless error analysis [only] when an aggravator has been invalidated or improperly defined, and, thus, eliminated from consideration [altogether]." Id. at 952 n.2. We concluded it was entirely proper for a state appellate court, as the OCCA did in this case, to cure an error caused by an unconstitutionally vague aggravating factor "by properly narrowing the aggravator and determining whether the evidence supported a finding of that aggravator as properly narrowed." Id.

Smith's second argument is also without merit. The court in Jones considered and rejected a similar argument. As we emphasized there, the limited issue on federal habeas review "is whether the Oklahoma Court of Criminal Appeals correctly determined a 'rational factfinder' could find sufficient evidence to support the constitutionally narrowed aggravator." Id. In any event, although Smith's argument is based upon language in the OCCA's opinion in Smith II, Smith overlooks the fact that the OCCA did not review the facts in the first instance to determine whether they supported the "especially heinous, atrocious or cruel" aggravator as narrowed in Stouffer. Rather, the state district court did so

50

and found that the evidence presented at trial was sufficient to support the aggravator. Although the state district court did not indicate what standard of proof it was applying, it presumably applied the standard typically employed by the jury in the second stage proceedings (i.e., "beyond a reasonable doubt"). See Ceja v. Stewart, 97 F.3d 1246, 1250 (9th Cir. 1996) (presuming that Arizona courts found the existence of an aggravating factor beyond a reasonable doubt even though they never used the reasonable doubt language in their opinions); Woratzeck v. Stewart, 97 F.3d 329, 336 (9th Cir. 1996) (same). The OCCA simply affirmed the state district court's finding on appeal.

III.

The judgment of the district court is AFFIRMED.