**Robert Leroy BRYAN, Petitioner–Appellant,**

v.

**Gary GIBSON, Warden, Oklahoma State Penitentiary, Respondent–Appellee.**

No. 00–6090.

United States Court of Appeals, Tenth Circuit.

Dec. 27, 2001.

---

Robert A. Nance of Riggs, Abney, Neal, Turpen, Orbison & Lewis (F. Andrew Fugitt, with him on the briefs), Oklahoma City, OK, for Petitioner–Appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the briefs), Oklahoma City, OK, for Respondent–Appellee.

Before KELLY, HENRY, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge.

Robert Leroy Bryan appeals the denial of habeas relief, *see* 28 U.S.C. § 2254, from his Oklahoma first degree malice murder conviction and death sentence. On appeal, Bryan challenges the sufficiency of the evidence to convict him, the retrospective determination that he was competent to stand trial, and his attorney's representation. We affirm.

The jury convicted Bryan of murdering his aunt. After finding that Bryan had previously been convicted of a violent felony and was a continuing threat to society, the jury sentenced Bryan to death. The Oklahoma Court of Criminal Appeals affirmed the conviction and death sentence, and denied post-conviction relief. *See Bryan v. State*, 935 P.2d 338 (Okla.Crim. App.1997); *Bryan v. State*, 948 P.2d 1230 (Okla.Crim.App.), *cert. denied*, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997).

██ Bryan then filed his federal habeas petition. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Bryan is entitled to relief only if he can show that the state court's resolution of his claims was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, or represented "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). We presume state court factual findings are correct, absent clear and convincing proof to the contrary. *Id.* § 2254(e)(1). If the state court did not address a claim's merit, however, this court then reviews the dis-

trict court's legal determinations *de novo* and its factual findings for clear error. *See Thomas v. Gibson*, 218 F.3d 1213, 1220 (10th Cir.2000).

## I. Sufficiency of evidence to convict Bryan of first degree malice murder.

██ Bryan argues the State's primarily circumstantial case was insufficient to support his first degree malice murder conviction. The appropriate inquiry here is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying *Jackson*, the Oklahoma Court of Criminal Appeals held there was sufficient evidence to support Bryan's capital murder conviction. *Bryan*, 935 P.2d at 358 n. 58, 358–59. That determination was reasonable.[1] *See, e.g., Romano*, 239 F.3d at 1164 (reviewing state court's sufficiency-of-the-evidence determination for reasonableness).

Under Oklahoma law, *see Jackson*, 443 U.S. at 324 n. 16, 99 S.Ct. 2781, " '[a] person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.' " *Bland v. State*, 4 P.3d 702, 713 (Okla.Crim. App.2000) (emphasis omitted) (quoting Okla. Stat. tit. 21, § 701.7(A)), *cert. denied*, 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001).

---

1. This court has not yet determined whether, under AEDPA, it reviews the state court's sufficiency-of-the-evidence determination as a legal issue under 28 U.S.C. § 2254(d)(1), or a factual finding under § 2254(d)(2) and (e)(1). *See, e.g., Romano v. Gibson*, 239 F.3d 1156, 1164 n. 2 (10th Cir.), *cert denied*, —— U.S. ——, ——, 122 S.Ct. 624, 628, 151 L.Ed.2d 545, 548 (2001). In this case, we would reach the same result under either standard. *See id.*

Viewed in the light most favorable to the State, *see Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, the trial evidence established the following: Bryan's widowed aunt, Inabel Bryan, disappeared from her home on Saturday, September 11, 1993. A neighbor found tire skid marks left in both the victim's front and back yards. The width between those tracks matched that of a 1986 Lincoln Bryan had rented for that weekend.

The victim's friends and family also found a fresh potted plant in her home. Bryan had bought that plant Saturday afternoon, September 11. Police would later find, near the victim's body, a receipt for that purchase.

Police found the victim's body on Thursday, September 16, on Bryan's parents' rural property, about a quarter of a mile from the home where Bryan lived with his parents. The victim had a pillowcase duct-taped over her head and had died from a gunshot wound to the forehead. There was a single vehicle's tracks through that field. A tire track across a mushroom there had the same tread pattern as the right rear tire on Bryan's rented Lincoln.

Authorities had decided to search that particular field on the Bryan property because, several years earlier, Bryan had solicited an undercover police officer to kidnap and kill a local banker. That failed scheme had involved the same location where police found Ms. Bryan's body.

The previous kidnapping scheme had also included plans to force the banker to sign a number of promissory notes, which Bryan intended to enforce against the banker's estate after his murder. Bryan had further planned to have the banker sign several personal checks, making them payable to Bryan. Likewise, police in this case found in Bryan's bedroom several handwritten promissory notes and agreements purportedly between the victim and Bryan, wherein the victim agreed she owed Bryan millions of dollars as a result of her investment in Bryan's failed businesses. A handwriting expert testified Bryan had written those agreements and had forged the victim's signatures.

Additionally, police found several of the victim's personal checks among Bryan's papers. According to the handwriting expert: The victim had signed one blank check; Bryan had forged the victim's signature on another; and the victim had signed four others, which Bryan had made payable to himself in varying amounts. Police also found the victim's checkbook just outside the Bryan home, burned in a can of ashes.

On September 8, the Wednesday before the victim's disappearance, Bryan had rented the 1986 Lincoln from a local car dealership. When making these arrangements, he had requested a car with a large trunk. He returned the Lincoln on Monday, September 13. Although he could not pay for the car's rental at that time, he did show the car dealership's owner one of the checks signed by the victim and made payable to Bryan.

Police found a hair, similar to the victim's, in that rental car's trunk. They also found grass and vegetation, like that found on the Bryan property, throughout the car's undercarriage. And the fibers lining the car's trunk were similar to those found on the victim's clothes and tape found on or near the victim's body.

In addition, police found a roll of duct tape in Bryan's room which was the same type as tape pieces found near the victim's body, as well as the duct tape holding the pillowcase over the victim's head. An expert testified that the edges of that tape roll taken from Bryan's bedroom matched the edges of one of the pieces of tape found near the body.

The bullet that killed the victim was most probably a .22 caliber bullet. It was also more consistent with CCI ammunition than it was to other brands. In one of the bedrooms in the Bryan home, police found a .22 caliber rifle loaded with one round of CCI ammunition. And, on Saturday night, September 11, a witness had seen what appeared to be that same weapon in the Lincoln's trunk. Officers also found, in Bryan's bedroom, two spent .22 caliber CCI-brand shells, one in Bryan's coveralls and another in his dresser drawer. That rifle had fired both those rounds. In addition, officers found, in Bryan's bedroom, a full box of fifty Winchester .22 caliber bullets, and a partial box of .22 caliber CCI ammunition. And police recovered a .22 caliber CCI bullet from the rental car's floor. A metallurgy study indicated that all the .22 caliber CCI bullets—the one that killed the victim, the one found in the rental car, and the ones found in the Bryan home were manufactured at the same time and could have come from the same box.

This evidence, although circumstantial, was certainly sufficient to support Bryan's first degree murder conviction. *See Rojem v. Gibson*, 245 F.3d 1130, 1141 (10th Cir.2001) (in dicta, determining circumstantial evidence was sufficient to support murder conviction); *see also Romano*, 239 F.3d at 1164–65. The state appellate court, therefore, reasonably denied Bryan relief on this claim.

## II. Competency.

Prior to the murder trial, the state court held a jury trial to determine Bryan's competency. Although the jury found Bryan competent, it did so under an unconstitutional burden of proof. *See Cooper v. Oklahoma*, 517 U.S. 348, 350, 355–56, 369, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). On direct appeal, therefore, the Oklahoma Court of Criminal Appeals remanded Bryan's case for the trial court to deter-

mine whether a retrospective competency hearing was feasible. The trial court found that it was and, in 1996, held another competency jury trial. That jury again found that Bryan had been competent to stand trial in January 1995. Here, Bryan challenges the feasibility of that retrospective competency hearing and asserts that he was in fact incompetent at the time of trial.

## A. Feasibility of retrospective competency hearing.

■ Due process mandates that a state provide adequate procedures to prevent prosecuting an incompetent criminal defendant. *See, e.g., Medina v. California*, 505 U.S. 437, 449, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). "Although retrospective competency hearings are disfavored, they are permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively" the defendant's competency. *Clayton v. Gibson*, 199 F.3d 1162, 1169 (10th Cir.1999) (quotation omitted); *see also McGregor v. Gibson*, 248 F.3d 946, 962 (10th Cir.2001) (en banc). "A meaningful" retrospective competency "determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." *Clayton*, 199 F.3d at 1169 (quotation omitted). Here, the Oklahoma Court of Criminal Appeals affirmed the trial court's determination that a retrospective competency hearing was feasible. *See Bryan*, 935 P.2d at 347, 351. That determination was reasonable. *See* 28 U.S.C. § 2254(d).

■ In considering the feasibility of a such a hearing, a federal habeas court considers four criteria—the passage of time, available contemporaneous medical records and prior competency determina-

tions, the defendant's statements during trial, and available witnesses who interacted with him at the time of trial. *See, e.g., McGregor,* 248 F.3d at 962–63. In this case, these factors support the state courts' determination that a meaningful, yet retrospective, competency hearing was possible.

■ The trial court conducted the retrospective competency hearing in August 1996, just one and one-half years after Bryan's January 1995 trial. *See, e.g., Clayton,* 199 F.3d at 1168–69 (almost six years between trial and retrospective competency hearing was "troubling," but did not preclude feasibility of retrospective competency determination in that case); *cf., e.g., Drope v. Missouri,* 420 U.S. 162, 183, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (determining there could not be meaningful retrospective competency determination after six years); *Pate v. Robinson,* 383 U.S. 375, 377, 387, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) (same); *McGregor,* 248 F.3d at 963 (determining meaningful retrospective competency hearing could not be held after eleven years and in light of minimal contemporaneous medical evidence).

Moreover, "[t]he passage of time is," in any event, "not an insurmountable obstacle if sufficient contemporaneous information is available." *Clayton,* 199 F.3d at 1169 (quotation omitted). Here, it was. Four mental health experts, who had personally examined Bryan within the year before, or a few months after, his trial, were available to testify at the retrospective hearing. *See*

*Barefield v. New Mexico,* 434 F.2d 307, 309 (10th Cir.1970); *cf. McGregor,* 248 F.3d at 963 (noting "disturbing lack of contemporaneous medical evidence" where only one psychiatrist testified for the State at previous competency hearing and he had not personally evaluated defendant, but rather testified from another doctor's five-year-old notes). Those experts also had access to Bryan's medical records, as well as records from a brief mental hospitalization in early 1990 and a lengthier eight-month stay in 1989.

Further, at the retrospective competency hearing, Bryan was able to present the testimony of the four defense attorneys who represented him before and during trial. His sister, an acquaintance, and his physician also testified as to Bryan's condition at the time of trial. In addition, the State presented the testimony of two guards and a sheriff who were around Bryan during this time.

In light of these factors, there was clearly sufficient evidence available at the time of the retrospective hearing to provide Bryan with a meaningful competency hearing. *See Clayton,* 199 F.3d at 1169–70. The state appellate court's decision upholding the trial court's retrospective competency hearing, therefore, was not unreasonable.[2] *See* 28 U.S.C. § 2254(d).

### B. Substantive due process claim.

■ Bryan also asserts a substantive due process claim, alleging that he was in fact incompetent at the time of trial. *See*

---

**2.** Bryan also appears to argue that the State, in any event, failed to present any of this available evidence at the hearing to determine the feasibility of a retrospective competency hearing and, therefore, the state trial court erred in determining such a hearing was feasible. According to Bryan, because of the State's failure to present sufficient evidence at the feasibility hearing, he should never have had to prove his incompetence at the retro-

spective competency hearing. "[I]t is enough[, however,] that the State affords the criminal defendant on whose behalf a plea of incompetence is asserted a reasonable opportunity to demonstrate that he is not competent to stand trial." *Medina,* 505 U.S. at 451, 112 S.Ct. 2572 (addressing whether State can constitutionally require criminal defendant to bear burden of proving his incompetence). This the state court did.

*McGregor,* 248 F.3d at 952. "A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.'" *Cooper,* 517 U.S. at 354, 116 S.Ct. 1373 (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). There is no real dispute here that Bryan possesses above-average intelligence and factually understood the legal proceedings against him. The fact "[t]hat a defendant can recite the charges against [him], list witnesses, and use legal terminology[, however, is] insufficient to demonstrate that he had a rational, as well as factual, understanding of the proceedings." *McGregor,* 248 F.3d at 952 (further quotation omitted). The question here, therefore, is whether Bryan had such a rational understanding at the time of trial. *See Lafferty v. Cook,* 949 F.2d 1546, 1550 & n. 2 (10th Cir.1991). "[A] defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Id.* at 1551. "[S]ufficient contact with reality" is, thus, the "touchstone for ascertaining the existence of a rational understanding." *Id.*

Despite significant evidence that Bryan is mentally ill, the jury at the retrospective competency hearing found that Bryan remained competent to stand trial. The Oklahoma Court of Criminal Appeals affirmed. *See Bryan,* 935 P.2d at 348–49. Because competency is a factual issue, *see, e.g., Thompson v. Keohane,* 516 U.S. 99, 111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (citing *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam)), this court's review is very limited. We must presume the jury's competency finding is correct,[3] *see Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam) (applying pre-AEDPA law), absent clear and convincing evidence that Bryan was in fact incompetent at the time of his trial, *see* 28 U.S.C. § 2254(e)(1). *See also, e.g., Wallace,* 191 F.3d at 1243–44. Bryan has failed to make such a showing.

Bryan did present evidence at the retrospective competency trial that he suffers from a paranoid delusional condition resulting from significant organic brain damage. Nonetheless, "this circuit has long recognized that the presence of some degree of mental disorder in the defendant does not necessarily mean that he is incompetent to assist in his own defense." *United States v. Mackovich,* 209 F.3d 1227, 1233 (10th Cir.) (direct criminal appeal) (further quotation, alteration omit-

---

3. Bryan appears to assert that this court should not presume this competency finding is correct because the state appellate court employed the wrong legal standard on direct appeal. *See Lafferty,* 949 F.2d at 1549–50 (noting first inquiry in determining whether factual finding should be presumed correct is whether factfinder employed correct legal standard in making that finding). While this court presumes correct factual findings made by either the state trial or appellate court, *see, e.g., Sumner v. Mata,* 455 U.S. 591, 592–93, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam), in this case, our review focuses on the jury's competency finding, *see Profitt v.* *Waldron,* 831 F.2d 1245, 1250 (5th Cir.1987) (pre-AEDPA case affording presumption to jury's competency finding); *see also, e.g., Wallace v. Ward,* 191 F.3d 1235, 1242–43 (10th Cir.1999) (focusing habeas review on state trial court's competency decision); *Bryson v. Ward,* 187 F.3d 1193, 1203–04 (10th Cir. 1999). *See generally Mata,* 455 U.S. at 592–93, 102 S.Ct. 1303 (noting correctness presumption "is equally applicable when a state appellate court, *as opposed to* a state trial court, makes the finding of fact" (emphasis added)). And, here, Bryan does not in any way challenge the legal standard with which the trial court instructed the competency jury.

ted), *cert. denied,* 531 U.S. 905, 121 S.Ct. 248, 148 L.Ed.2d 179 (2000); *see also Walker v. Gibson,* 228 F.3d 1217, 1227 (10th Cir.2000), *cert. denied,* — U.S. —, 121 S.Ct. 2560, 150 L.Ed.2d 725 (2001), *abrogated on other grounds by Neill v. Gibson,* 278 F.3d 1044 (10th Cir.2001).

Two mental health experts, Dr. Philip Murphy, Ph.D. and Dr. John Smith, M.D., testified that Bryan was probably incompetent at the time of trial. And four different defense attorneys testified that Bryan was unable to assist them rationally because he believed and asserted facts in his defense that could never be verified and were apparently untrue. Specifically, Bryan told his attorneys that, at the time of the murder, he had been involved with three other individuals in negotiating with the victim to settle her debt owed to Bryan as a result of her investment in Bryan's failed businesses. It was these men, according to Bryan, who had directed him to rent the Lincoln that weekend and purchase the potted plant found in the victim's home.

Bryan had, in fact, previously been involved in two business enterprises which eventually did fail, after enjoying initial success. There was, however, no evidence that the victim had ever been involved in any way in these business ventures. Nor could anyone ever locate the three individuals Bryan implicated in these events surrounding the murder. Bryan's attorneys asserted, however, that, despite their apparent falsity, Bryan genuinely believed these facts were true.

According to Dr. Murphy, Bryan's mental illness focused on these failed businesses. The doctor, therefore, opined that this unfounded defense Bryan consistently asserted to his attorneys was probably part of Bryan's delusional system. That system centered on his belief that he had had a very lucrative idea or invention that would have revolutionized food processing, but that people had stolen this idea or invention from him, causing Bryan's businesses to fail. Bryan contends that he was unable to assist his attorneys rationally at the time of trial because he was mired within these delusions, which colored his communications and the way he processed information.

Despite this testimony, however, there was also evidence supporting the jury's competency finding. Dr. Richard Kahoe, Ph.D., evaluated Bryan in December 1993, just over a year before trial, and found that Bryan was competent. Dr. Kahoe determined that Bryan, at that time, was not delusional, nor psychotic. In addition, Dr. Frederick Smith, Ph.D., a prison psychologist, saw Bryan professionally from April 1994 through the time of trial, in January 1995. During that time, Bryan exhibited no significant abnormalities. Nor did Dr. Smith note any evidence of hallucinations or detect any delusions. Psychological testing further supported Dr. Smith's observations. Additionally, two corrections officers and a county jail administrator all testified that Bryan, at the time of trial, was able to understand jail procedures, communicate with them, and understand their directions. Even Bryan's own expert, Dr. John Smith, testified that when he examined Bryan in December 1995, eleven months after his conviction and sentencing, Bryan was competent.[4] And, although psychiatric experts had previously deemed Bryan incompetent to stand trial on earlier charges, in March 1989, he did regain his competency in late 1989 and was again

---

**4.** Dr. Smith did, in later state post-conviction proceedings, question this competency deter- mination.

deemed competent in 1990 to stand trial on those charges.

The evidence concerning Bryan's competency was, thus, controverted. And resolving the competency question depended heavily on the factfinders' "appraisal of witness credibility and demeanor." *Thompson*, 516 U.S. at 111, 116 S.Ct. 457; *see also Maggio*, 462 U.S. at 117–18, 103 S.Ct. 2261. Jurors "apparently accepted the prosecution's argument that" a criminal defendant's seeking to shift blame to other, perhaps fictitious individuals was not a product of Bryan's mental illness so much as it was an attempt to avoid criminal liability. *Mackovich*, 209 F.3d at 1232 (direct criminal appeal). In light of that, Bryan has failed to rebut, by clear and convincing evidence, the jury's factual finding that he was competent to stand trial. *See* 28 U.S.C. § 2254(e)(1). Nor can we say the jury's factual determination was unreasonable, "in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

### III. Ineffective assistance of trial counsel.

At trial, defense counsel failed to present any of the substantial evidence available concerning Bryan's mental illness. Bryan now argues that his trial attorney was constitutionally ineffective for failing to do so.

### A. Conflict of interest.

 Bryan first contends that his retained trial attorney did not present any psychiatric evidence because Bryan's parents, who were paying the attorney, did not want evidence of Bryan's mental illness to be presented at trial. Because Bryan did not raise this conflict-of-interest claim until his state post-conviction relief application, however, the Oklahoma Court of Criminal Appeals deemed him to have defaulted this claim. *See Bryan*, 948 P.2d at 1232–33. As cause excusing this default,[5] Bryan asserts that his appellate attorney was ineffective for failing to raise this claim on direct appeal. *See, e.g., Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir. 1999). Direct-appeal counsel will be ineffective if counsel was "objectively unreasonable" in failing to raise the conflict-of-interest claim on direct appeal and if there is a "reasonable probability" that, had counsel raised this claim, Bryan "would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). The Oklahoma Court of Criminal Appeals rejected Bryan's ineffective-appellate-assistance claim, without discussion of the underlying claim's merit. *See Bryan*, 948 P.2d at 1232–33. The district court, following an evidentiary hearing,[6] made relevant factual findings, which we review only for clear error. *See Thomas*, 218 F.3d at 1220; *see also United States v. Migliaccio*, 34 F.3d 1517, 1526 (10th Cir.1994) (on direct criminal appeal, reviewing factual findings underlying actual conflict claim only for clear error). We conclude Bryan's conflict-of-interest claim lacks clear merit. The state appellate court's decision rejecting this

---

5. On appeal to this court, Bryan does not challenge this procedural bar's adequacy or its independence from federal law. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729–30, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also, e.g., Smallwood v. Gibson*, 191 F.3d 1257, 1268 (10th Cir.1999) (holding that, although State bears ultimate burden of proof, habeas petitioner has burden to set forth specific allegations challenging state bar's adequacy, once State pleads that affirmative defense).

6. The State does not challenge the district court's conducting an evidentiary hearing. *See generally Romano*, 239 F.3d at 1174 n. 9 (declining to address whether habeas petitioner was entitled to evidentiary hearing, when district court had already conducted one).

claim, therefore, was not unreasonable. *See* 28 U.S.C. § 2254(d); *see also Aycox v. Lytle*, 196 F.3d 1174, 1177–78 (10th Cir. 1999) (affording deference, under AEDPA, to state court's rejection of claim's merit, despite that court's failure to express its reasoning).

■ Bryan's parents initially retained attorney Raymond Munkres to represent Bryan. Munkres withdrew, however, after the initial competency trial. Two court-appointed attorneys, first Wesley Gibson and then Steven Hess, subsequently represented Bryan. In preparation for trial, Hess filed notice that he intended to present an insanity defense and listed several mental health experts as expected trial witnesses. Within just a few weeks of trial, however, Bryan replaced Hess with another retained attorney, Jack Freeman. Bryan's parents paid Freeman's fees. Freeman represented Bryan at his first trial, which resulted in a first-stage mistrial. At that trial's start, Freeman withdrew the insanity defense. At the second trial, four months later, Freeman did not present any evidence concerning Bryan's mental problems, at either the first or second stage. Bryan now contends that Freeman failed to do so because Bryan's parents did not want such evidence presented.

■ A criminal defendant has a Sixth Amendment right to conflict-free representation. *See Smith v. Massey*, 235 F.3d 1259, 1265 (10th Cir.2000) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)), *cert. denied,* —— U.S. ——, 122 S.Ct. 235, 151 L.Ed.2d 169 (2001), *abrogated on other grounds by Neill,* 278 F.3d at 1044 (10th Cir.2001). That right "extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person." *Hale v. Gibson*, 227 F.3d 1298, 1312 (10th Cir.2000) (further quotation omitted), *cert. denied,* ——

U.S. ——, 121 S.Ct. 2608, 150 L.Ed.2d 764 (2001). And there are certainly "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party...." *Wood v. Georgia*, 450 U.S. 261, 268–69, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Where, as here, however, Bryan "raised no objection at trial," *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708, he cannot now prevail unless he demonstrates "that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance," *Burger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (further quotation omitted). If he can make that showing, we will presume prejudice to his defense. *See id.; see also Cuyler*, 446 U.S. at 349–50, 100 S.Ct. 1708. The mere possibility of a conflict, however, is insufficient. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708.

■ "An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client." *United States v. Alvarez*, 137 F.3d 1249, 1252 (10th Cir.1998) (28 U.S.C. § 2255 proceeding). Here, Bryan has failed to demonstrate that there was an actual conflict of interest.

First, the district court found that Bryan's parents had not hired Freeman on the express condition that he not present any psychiatric evidence. *See* District Ct. Order at 77–78; *see id.* at 68. In making this factual finding, the district court credited defense attorney Freeman's testimony to this effect. The court further noted this testimony was bolstered by Freeman's testimony that he had had Dr. Murphy present and ready to testify on the eve of sentencing. *See id.* at 78. Conversely, the district court discounted Bryan's mother's affidavit that Freeman had agreed, at the outset, not to present any evidence of

Bryan's mental problems. Mrs. Bryan had executed this affidavit after doctors diagnosed her as suffering from moderate to severe cardiovascular dementia. *See id.* Furthermore, Bryan's mother never reviewed her own affidavit for accuracy. Instead, Bryan's post-conviction attorneys had Bryan's sister review the affidavit for accuracy.

Because "[t]he credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court," *United States v. Browning,* 252 F.3d 1153, 1157 (10th Cir.2001) (direct criminal appeal; further quotation omitted), these factual findings are not clearly erroneous. *See also, e.g., Romano,* 239 F.3d at 1175 (deferring to district court's credibility determination).

It is also clear, however, and the district court further found, that Freeman was aware that Bryan's parents did not want him to present mental-illness evidence at trial. *See* District Ct. Order at 78. For that reason, the district court presumed there was an actual conflict between Bryan's parents' wishes and Bryan's best interest in asserting such evidence to the jury. *See id.* at 77. In doing so, the district court disregarded the fact that Bryan did not want his defense attorney to present any psychiatric evidence. *See* October 27, 1999 Hr'g Tr. at 21, 22, 36; *see also* Appellant's Opening Br. at 45. The district court reasoned that, despite Bryan's wishes, it would, nevertheless, have been in his best interest for defense counsel to present such evidence. *See* District Ct. Order at 68, 77. The district

court's reasoning, however, is "clearly inconsistent with the Supreme Court's view of the attorney-client relationship.... [T]he Court [has] noted that 'a client controls the significant decisions concerning his representation' and can thus 'fire his attorney if he is dissatisfied with his attorney's performance.'" *Smith,* 235 F.3d at 1269 (quoting *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 568–69, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990)). In light of Bryan's earlier replacing his second court-appointed attorney, who was preparing to present evidence of Bryan's mental problems, and Bryan's post-conviction testimony that he did not want his attorney to present any psychiatric evidence, "we are unwilling to assume that [Bryan] would have allowed" Freeman to present any evidence pertaining to Bryan's mental problems. *Id.* (holding no actual conflict existed). Further, although the district court noted that "a person suffering from mental illness or delusions may well believe that he is not mentally ill and may be unable to make decisions based on a realistic evaluation of his best interests," District Ct. Order at 68–69, Bryan was in fact found competent to stand trial.[7] *See generally Cooper,* 517 U.S. at 354, 116 S.Ct. 1373 ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel." (further quotation omitted)). "Clearly one who is competent to stand trial is competent to make decisions as to the course of his future." *Evans v. Bennett,* 440 U.S. 1301, 1304, 99 S.Ct. 1481, 59

---

7. This court, in *Lafferty,* 949 F.2d at 1556, held that due process does not permit assuming "a defendant suffering from paranoid delusions is to be held competent to make decisions on how best to present his mental state to a judge and jury even though that mental illness may strip him of the ability to realistically determine where his best interests lie."

Nonetheless, *Lafferty* is distinguishable. In that case, this court refused to presume the state court's competency determination was correct because the state court had applied an incorrect constitutional standard when it determined competence. *See id.* at 1551. There is no similar problem here.

L.Ed.2d 756 (1979) (Rehnquist, C. J., nevertheless granting capital defendant's mother's motion for stay of execution, where defendant sought to be executed).

The record, therefore, establishes that Bryan, like his parents, did not want defense counsel to put on any psychiatric evidence. Because "[a] conflict does not arise" unless "the interests of [the third party] and defendant [are] divergent in the current litigation, such that the [third party] has an interest in the outcome of the particular case at issue that is adverse to that of the defendant," *Hale*, 227 F.3d at 1313, Bryan has failed to establish that there was any actual conflict here.

Even if we assume, as did the district court, that there was an actual conflict, however, Bryan has failed to prove that the conflict adversely affected defense counsel's representation. *See, e.g., Burger*, 483 U.S. at 785, 107 S.Ct. 3114 (determining that, even if there was an actual conflict, it did not harm counsel's advocacy). Freeman testified that Bryan's parents' wishes did not dictate his defense strategy. *See* October 27, 1999 Hr'g Tr. at 89, 108. The district court found this testimony "highly credible and convincing." District Ct. Order at 79; *see Burger*, 483 U.S. at 784–85, 107 S.Ct. 3114; *Smith*, 235 F.3d at 1269 n. 4 (dicta). That credibility finding is also not clearly erroneous. *See, e.g., Browning*, 252 F.3d at 1157; *Romano*, 239 F.3d at 1175.

Even had Bryan's direct-appeal counsel raised this conflict-of-interest claim on direct appeal, therefore, there is not a reasonable probability that Bryan would have prevailed. *See Robbins*, 528 U.S. at 285–86, 120 S.Ct. 746. His appellate attorney, thus, was not constitutionally ineffective for failing to raise this claim on direct appeal. Bryan's procedural default, there-

fore, precludes further habeas review of his conflict-of-interest claim.[8]

### B. Ineffective representation.

Bryan argues that, even if Freeman was not laboring under an actual conflict of interest, he was, nevertheless, constitutionally ineffective for failing to present any mental health evidence at either the trial's first or second stage. Bryan will be entitled to habeas relief on this claim only if he can establish both that trial counsel's performance was deficient and that he was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we resolve this ineffective-assistance claim by addressing Freeman's performance, we affirm the denial of habeas relief without addressing *Strickland*'s prejudice inquiry. *See id.* at 697, 104 S.Ct. 2052.

"Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. And there is a "strong presumption that defense counsel's conduct falls within the wide range of reasonable professional assistance." *Id.; see also Kimmelman v. Morrison*, 477 U.S. 365, 383, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To prevail, therefore, Bryan must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quotation omitted). "[S]trategic choices made after thorough investigation of law and facts rel-

---

8. Bryan does not assert that our failure to review this claim further will result in a fundamental miscarriage of justice. *See, e.g.,*

*Schlup v. Delo*, 513 U.S. 298, 314–15, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

evant to plausible options are virtually un-challengeable." *Id.* at 690, 104 S.Ct. 2052.

There is no question in this case that trial counsel had investigated and was well aware of the significant amount of evidence available concerning Bryan's mental condition. Nor is there any question that counsel's decision not to present any mental health evidence, at either trial stage, was strategic. When Freeman first took over Bryan's representation, within one month of the first trial, he inherited appointed counsel's preparation for a defense relying upon this psychiatric evidence. By that time, appointed counsel had filed notice of his intent to rely on an insanity defense and had garnered substantial evidence establishing Bryan's mental illness, including a brain scan, previous mental hospitalization records, and reports from several mental health experts who were listed as expected trial witnesses. Yet, Freeman, aware of this mental health evidence and having met with these experts, chose, at the beginning of the first trial, to withdraw the insanity defense and to defend, at both the first and second trials, without introducing any such evidence. *Cf. Battenfield v. Gibson,* 236 F.3d 1215, 1229 (10th Cir.2001) (holding counsel made "no strategic decision at all because [he] was ignorant of various other ... strategies he could have employed"). "The relevant question [here, then] is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *see also, e.g., Burger,* 483 U.S. at 789 n. 7, 107 S.Ct. 3114.

### 1. First stage.

█ Bryan contends that his defense attorney should have presented evidence of his mental illness during the trial's first stage in support of either an insanity defense or a second-degree murder instruction. *See* Appellant's Opening Br. at 40,

43–44. The Oklahoma Court of Criminal Appeals, in denying relief, held that counsel had investigated and was aware of the evidence of Bryan's mental illness, but made the strategic decision instead to challenge the State's evidence of guilt. *See Bryan,* 935 P.2d at 363 (holding also that such strategy did not prejudice Bryan). That denial was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

To assert an insanity defense, "Oklahoma ... requir[es] the defendant to show that at the time of the crime he suffered from a mental disease or defect rendering him unable to differentiate between right and wrong, or unable to understand the nature and consequences of his actions." *James v. Gibson,* 211 F.3d 543, 553 (10th Cir.2000) (further quotation omitted), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 886, 148 L.Ed.2d 794 (2001). Dr. Murphy, in his May 1994 report, did indicate that "Mr. Bryan suffers from a serious mental disorder which places in serious question ... his legal culpability in the crimes for which he is charged." O.R. at 270. Nonetheless, Freeman testified that Dr. Murphy later indicated to Freeman that Bryan was not legally insane. *See* October 27, 1999 Hr'g Tr. at 83–85. Nor was there any other evidence specifically supporting a legal insanity defense. *See id.* at 26, 70–73, 83–85, 96, 106.

In addition, under Oklahoma law, second degree murder "occurs '[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.'" *Gilson v. State,* 8 P.3d 883, 917 (Okla.Crim. App.2000) (quoting Okla. Stat. Ann. tit. 21, § 701.8(1)), *cert. denied,* 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001). The

facts in this case, however, do not suggest the lack of a premeditated intent to kill the victim. Rather, the victim was abducted from her home and shot, having had a pillowcase taped over her head. Further, there was little evidence specifically indicating Bryan was not capable of forming the requisite intent for first degree malice murder.[9] *See* October 27, 1999 Hr'g Tr. at 72–73, 85–86, 87.

In contrast, the State's case, albeit strong, was almost entirely circumstantial. *See Smith v. Gibson*, 197 F.3d 454, 461–62 (10th Cir.1999) (holding defense counsel's argument was reasonable strategy in light of State case's circumstantial nature). And there was evidence indicating that Bryan's physical condition had so deteriorated at the time of the murder, due to his diabetes, that he was physically incapable of carrying out this crime.

Moreover, Bryan did not want his attorney to present evidence suggesting he was mentally ill. And we must presume Bryan was competent to rationally assist defense counsel at trial. *See supra* section II(B). "The reasonableness of counsel's actions[, therefore,] may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, *see also, e.g., Romano*, 239 F.3d at 1181, citing cases. "Although trial counsel has an independent duty to investigate and make a case in [defense], counsel also has to be responsive to the wishes of his client." *Romano*, 239 F.3d at 1181; *see also Wallace*, 191 F.3d at 1247 (holding attorney's decision to acquiesce to petitioner's wishes that attorney not present any mitigating evidence was not deficient performance).

In light of these facts, the state appellate court's denial of relief was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

### 2. Second stage.

■ Bryan argues that, regardless of whether trial counsel reasonably decided not to present the available psychiatric evidence during the trial's first stage, counsel should have presented it in mitigation during the capital sentencing proceeding. The Oklahoma Court of Criminal Appeals held that trial counsel had investigated and was aware of the available psychiatric evidence, but made a plausible strategic decision not to use that evidence, instead relying on any residual doubt the jury might have had as to Bryan's guilt. *See Bryan*, 935 P.2d at 363. The state appellate court further determined trial counsel reasonably believed that presenting any psychiatric evidence would undermine that defense. *See id.* The state appellate court's decision was again not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

" '[R]esidual doubt has been recognized as an extremely effective argument for defendants in capital cases.' " *Smith*, 197 F.3d at 462 (quoting *Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (further quotation omitted)). Such a strategy here was reasonable in light of the entirely circumstantial case supporting Bryan's guilt and the existence of some evidence suggesting Bryan was not physically able to carry out the murder. *See id.* at 457–58, 462, 106 S.Ct. 1758.

---

**9.** For these same reasons, Bryan's claim also fails to the extent he is arguing that this

evidence could have supported other, lesser offenses. *See* Appellant's Opening Br. at 40.

Bryan, nonetheless, argues that trial counsel's strategy cannot be considered reasonable because it was founded upon counsel's mistaken belief that this mental health evidence could not be useful at sentencing unless it would establish that Bryan was either incompetent to stand trial or legally insane at the time of the murder. Although Freeman was primarily concerned with incompetence and legal insanity, *see* October 27, 1999 Hr'g Tr. at 86, 87, 96–97, 105–06, 108–09, he further believed, reasonably, that presenting this evidence would also undermine his residual doubt defense, *see id.* at 86–87, 89.

And, while evidence that Bryan was mentally ill would have been legitimate mitigating evidence, *see Burger,* 483 U.S. at 789 n. 7, 107 S.Ct. 3114, defense counsel feared that, here, it would actually further support the State's claim that Bryan represented a continuing threat to society, giving jurors more reason to sentence Bryan to death. *See* October 27, 1999 Hr'g Tr. at 85–86, 105–06. The state appellate court determined trial counsel was reasonable in that belief, too. *See Bryan,* 935 P.2d at 363. Such psychiatric evidence does present a double-edged sword. *See also* October 27, 1999 Hr'g Tr. at 30 (Bryan's legal expert). Further, although that evidence might have explained that Bryan, in abducting and killing his aunt, was acting under a delusional belief that his aunt owed him money as a result of his failed business, Freeman's mental health experts would also have testified that he knew right from wrong and remained capable of forming the intent to kill. *See id.* at 26, 70–73, 83–85, 87, 96, 106. Thus, although Freeman might have been able to explain why Bryan irrationally believed his aunt, and others, owed him money, the evidence still indicated Bryan had killed his aunt, and had earlier plotted to abduct and murder a local banker, with the understanding that what he was doing was wrong. Freeman, therefore, could have

reasonably feared that this evidence, rather than providing a basis for jurors not to sentence Bryan to death, might instead actually support the State's contention that Bryan was a continuing threat and deserved to die. *See Burger,* 483 U.S. at 793–94, 107 S.Ct. 3114; *see also Darden v. Wainwright,* 477 U.S. 168, 184–87, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

This is so even in light of the evidence indicating antipsychotic medication might improve Bryan's condition. During his eight-month commitment in 1989, Bryan regained his competency after treatment that included daily doses of Navane. Although the hospital discharged Bryan on Navane in 1989, the record indicates he stopped taking that medication immediately upon his hospital release. He, nonetheless, retained his competency after that. And testimony indicated that Navane would not correct Bryan's organic brain syndrome, although it might be helpful in suppressing its secondary symptoms, including his delusions.

Lastly, but perhaps most importantly, Bryan did not want defense counsel to present any psychiatric evidence. *See, e.g., Romano,* 239 F.3d at 1181; *Smith,* 235 F.3d at 1278; *Wallace,* 191 F.3d at 1247–48. And in this case, we must presume that Bryan was competent to make that determination. *See supra* section II(B). Again, "[c]ounsel's actions are usually based, quite properly, on [the defendant's] informed strategic choices." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see Wallace,* 191 F.3d at 1246–47 (holding trial counsel was not ineffective in acquiescing to competent capital defendant's wish that attorney not present mitigating circumstances or challenge State's aggravating evidence); *see also Smith,* 235 F.3d at 1278 (holding defense attorney's second-stage strategy was reasonably shaped by capital defendant's decision not to testify

that she was under influence of drugs and alcohol at time she committed murder). *See generally Hale,* 227 F.3d at 1315 ("[T]he failure to present available mitigating evidence is not per se ineffective assistance of counsel.") (quotation omitted).

Therefore, we cannot say, under these facts, that counsel's strategic choice not to present this psychiatric evidence during the capital sentencing proceeding was completely unreasonable. *Cf. Burger,* 483 U.S. at 793–94, 107 S.Ct. 3114 (holding counsel had reasonable basis for his strategic decision that explanation of petitioner's troubled history would not have minimized his risk of receiving death sentence). "There are countless way to provide effective assistance in any given case." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). And we are mindful that it is "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Nix,* 475 U.S. at 165, 106 S.Ct. 988. Instead, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or [even] appropriate, but only what is constitutionally compelled.'" *Burger,* 483 U.S. at 794, 107 S.Ct. 3114 (quoting *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Here, Bryan has failed to establish that "in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052; *see also, e.g., Kimmelman,* 477 U.S. at 382, 106 S.Ct. 2574 (noting only those habeas petitioners whose attorneys' "gross incompetence" has denied them fair trial are entitled to habeas relief); *Gonzales v. McKune,* 247 F.3d 1066, 1072 (10th Cir.2001) (holding that, for counsel's performance to be constitutionally ineffective,

his decision must have been "not simply wrong, but instead ... completely unreasonable").

Because we are able to resolve this habeas claim on *Strickland's* performance prong, we need not further address any resulting prejudice.

### IV. Conclusion.

For these reasons and having considered all Bryan's arguments, we affirm the district court's denial of habeas relief and deny all pending motions.

HENRY, J., concurring in part and dissenting in part.

This case is troubling on several levels. But the most troubling problem is that the defendant suffered from the clearly and unreasonably ineffective assistance of his counsel, Mr. Freeman. Mr. Freeman's failure during the sentencing stage to introduce evidence that Mr. Bryan—who had been found incompetent to stand trial for a previous crime—had a long and difficult battle with mental illness, a battle made all the more difficult by disabling diabetes, no doubt caused prejudice to the defendant. In light of Mr. Bryan's previous history, I cannot conclude that his attorney's failure to present this evidence at the sentencing hearing, and even more egregious, his attorney's failure to understand that these mental defects could be considered as mitigating circumstances, is anything less than unreasonable ineffective assistance of counsel. As such, I must respectfully dissent.

### I. Additional Background on Competence

First, as the majority opinion notes, Mr. Bryan is severely afflicted with diabetes and presented significant evidence at a "procedurally disfavored" retrospective competency hearing that he suffered from

a paranoid delusional condition resulting from organic brain damage. He had also previously been determined to be incompetent to assist his counsel in a separate criminal investigation. Mr. Bryan's written correspondence and statements recount incredible stories, offer implausible accounts of events, and indicate the gravity of his dementia. In addition, before us are reams of evidence, including Mr. Bryan's hospitalization records and reports from mental illness experts, detailing Mr. Bryan's continuing battles with a grave mental disorder. His disorder was apparently so grave in fact that one expert stated it "place[d] into serious question his competency to stand trial, as well as his legal culpability in the crimes for which he is charged." O.R. at 270.

Mr. Bryan's illness manifested itself in his deluded and tragic actions in the case at hand. Mr. Bryan repeated the most significant portions of his earlier attempted crime, using the same location to conceal the body that he had revealed to the police in his earlier crime and the same tactic of seeking to use unsigned and forged checks to repay his so-called business losses. The agreements he forged were literally unbelievable, stating that his aunt owed him millions of dollars. In spite of the impossible nature of his claims, Mr. Bryan at one point proudly displayed one of these checks to the car dealer from whom he rented the car.

The majority, citing our admittedly restrictive standard of review, says the argument can be made that we must defer to the jury's finding of competence in what our cases call the "procedurally disfavored" retrospective competency hearing. Yet, the results of this hearing suggest why they are disfavored.

As the majority relates, two mental health experts, Drs. Murphy and Smith, testified that Mr. Bryan was procedurally incompetent at the time of trial. Four defense attorneys testified that Mr. Bryan was unable to assist them due to his irrational beliefs. For example, he was obsessed with a completely fictional "revolutionary" idea for food processing that he consistently argued—as he did in the previous case as well—that people had stolen from him.

The state introduced its own experts. Dr. Richard Kahoe, Ph.D., evaluated Mr. Bryan a year before trial and concluded, after a brief interview, that he was competent. The prison psychologist also concluded that Mr. Bryan was competent. In spite of the state's evidence, it is difficult to imagine how a jury could find Mr. Bryan competent. Yet, under our standard of review, I agree we are held to reviewing this under a reasonableness standard, and although I cannot in good faith imagine how the result was reached, I must defer to the standard of review as the majority has applied it. However, as we evaluate assistance of counsel under the totality of the circumstances, we must not close our eyes to this troubling evidence.

## II. Standards of Review

Although, as stated above, some of the majority's conclusions are quite troubling, the major issue that requires remand is Mr. Bryan's ineffective assistance of counsel. I believe that counsel was ineffective in the guilt phase, but I will concentrate on Mr. Bryan's best argument: that he received unreasonably ineffective assistance in the all-important "second" or "sentencing phase."

I realize that our standard of review again is strict. Mr. Bryan is entitled to habeas relief on his claim of ineffective assistance of counsel only if he can establish that (1) Mr. Freeman's performance was constitutionally deficient and (2) that there is a reasonable probability that, but

for counsel's errors, the outcome of the proceedings would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mr. Bryan "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (internal quotation marks and citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052.

As to his claims that Mr. Freeman was ineffective for not presenting evidence of his organic brain damage at the sentencing, this issue was decided by the state court on the merits, so we must determine that the state court's adjudication of those claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Ultimately, there must be "a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *See Williams v. Taylor,* 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted).

### III. Discussion

"The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson,* 239 F.3d 1156, 1179 (10th Cir.2001). The Supreme Court consistently has held that "the sentencer may not refuse to consider

or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). Accordingly, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (emphasis in original) (O'Connor, J., concurring); *see also Mayes v. Gibson,* 210 F.3d 1284, 1288 (10th Cir.2000) (stating that mitigation evidence "affords an opportunity to humanize and explain—to individualize a defendant outside the constraints of the normal rules of evidence"). "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *Brown,* 479 U.S. at 541, 107 S.Ct. 837 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality)).

Thus, a criminal defendant who is charged with a capital offense has the right to present virtually any evidence in mitigation at the penalty phase. *See Hitchcock v. Dugger,* 481 U.S. 393, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (citing *Skipper,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1). "We are therefore compelled to insure the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes* 210 F.3d at 1288 (quoting *Lockett v. Ohio,* 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). When examining the counsel's investigation and presentation of mitigation evidence, we have recognized that "the right to present mitigating evidence to the jury is constitutionally pro-

tected," *id.,* and that there is a corresponding "need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." *Battenfield v. Gibson,* 236 F.3d 1215, 1226 (10th Cir.2001) (quoting *Cooks v. Ward,* 165 F.3d 1283, 1294 (10th Cir.1998)).

In light of these admonitions, I will examine Mr. Freeman's performance. First I shall consider Mr. Freeman's performance overall, and then I shall address why Mr. Freeman's deficient performance prejudiced his client.

### A. Deficient Performance in the Sentencing Phase

Mr. Freeman's performance exhibited several deficiencies, most importantly his failure to (1) prepare mitigation evidence relating to Mr. Bryan's history of mental illness for, or present this mitigation evidence at, the sentencing phase; (2) comprehend the nature of the compelling and substantial mitigation evidence in the record; and correspondingly, (3) articulate and explain to his client the purpose that presentation of Mr. Bryan's mental history would serve at the sentencing stage. The cumulative effect of these factors amounted to deficient performance on the part of Mr. Freeman.

#### a. Mitigation Evidence Related to History of Mental Illness

During the sentencing stage, Mr. Freeman presented brief testimony from Mr. Bryan, his sister and his mother. First, Mr. Bryan testified to offer an explanation for an alleged assault that took place while he was incarcerated. Next, Mr. Bryan's mother and sister testified that Mr. Bryan had high moral standards, was nonviolent, and was a caring family member. This is the extent of evidence that Mr. Freeman believed he could present to counter the government's evidence of aggravators. *See* Vol. VII, at 1695–1734 (trial transcript).

"Mitigating evidence plays an overwhelmingly important role in the 'just imposition of the death penalty.'" *Romano,* 239 F.3d at 1180 (quoting *Mayes,* 210 F.3d at 1288). "'As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant.'" *Id.* (quoting Jonathan P. Tomes, *Damned If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation,* 24 Am. J.Crim. L. 359, 364 (1997)). Similarly, our case law is consistent with that of our sister circuits in rejecting the notion that a strategic decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.[1]

Here, Mr. Freeman admits that he did no other investigation or preparation for

---

1. *See Williamson v. Ward,* 110 F.3d 1508, 1518 (10th Cir.1997); *Glenn v. Tate,* 71 F.3d 1204, 1207 (6th Cir.1995) (reversing sentence where "jury given *virtually no information* on [defendant's] history, character, background and organic brain damage," because "counsel never took the time to develop it") (emphasis added); *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) (court "reject[ed] the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"). *See also Austin v. Bell,* 126 F.3d 843, 849 (6th Cir.1997) (stating that failure to put on mitigating evidence "because [counsel] did not think that it would do any good" was an *"abdication of advocacy"*) (emphasis added). "In light of its importance, investigation and preparation of a case in mitigation should begin prior to trial, well before any determination of guilt at the first stage." *Romano,* 239 F.3d at 1180 (citing *Williams,* 529 U.S. at 395, 120 S.Ct. 1495 (noting counsel's deficient preparation for sentencing did not begin until one week prior to trial)).

the second stage apart from talking to Mr. Bryan, Mr. Bryan's family and a doctor who had treated Mr. Bryan for diabetes. Mr. Freeman incorrectly believed "that's all [he] had" and he sought out nothing further. Evid. Hr'g Tr. at 108.

Mr. Bryan's unrefuted testimony likewise confirms that "there just wasn't any" preparation made for the penalty phase. Mr. Bryan was told minutes before he was called to the witness chair that he would be testifying. Mr. Bryan never discussed with Mr. Freeman the possibility of using mental health evidence in the second stage of the trial. *Id.* at 36–37.

### b. Counsel's Failure to Comprehend Compelling and Substantial Mitigation Evidence

It is remotely conceivable that the decision not to extensively investigate a defendant's background may be, in exceptional cases, tactical. However, before an attorney can insulate his "strategic" behavior from review by claiming that a decision to forego mitigation evidence was tactical, "an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances." *Brecheen v. Reynolds,* 41 F.3d 1343, 1369 (10th Cir. 1994) (quoting *Bolender v. Singletary,* 16 F.3d 1547, 1558 (11th Cir.1994) (emphasis in original)). *Mr. Freeman could not have weighed the risks and benefits of presenting the testimony regarding Mr. Bryan's mental capacity where he did not even realize that he could present that testimony.* He was apparently unable to articulate to Mr. Bryan any purpose mitigation evidence might serve and never considered any impact the mitigating evidence would have upon Mr. Bryan's moral culpability. *Cf. Battenfield,* 236 F.3d at 1229 (holding counsel's performance ineffective and noting "there was no strategic decision at all because [counsel] was ignorant of various

other mitigation strategies he could have employed").

Mr. Freeman's own testimony makes this clear. Mr. Freeman admitted that he characterized Mr. Bryan's stories and events regarding the farm and business ventures as fantastic and delusional. He does not dispute the conclusions of the various medical reports that state Mr. Bryan was confused, depressed, delirious, paranoid, psychotic and delusional and that he had suffered brain atrophy and organic brain damage. He admits that multiple medical records indicated there was substantial evidence from competent professionals regarding his client's organic and mental problems. *See* Evid. Hr'g Tr. at 90–93, 100–03, 112. He acknowledges that Dr. Murphy concluded "Mr. Bryan suffers from a serious mental disorder which places into serious question his competence to stand trial, as well as his legal culpability in the crimes for which he is charged." *Id.* at 95. It is almost unbelievable that Mr. Freeman did not seek to introduce this evaluation, which is appended to this dissent. *See id.* at 90–99.

Most important is not what Mr. Freeman admitted he knew, but what he admitted he did not know about mitigation. Mr. Freeman clearly testified that he "saw no use for the experts' mental testimony, except to prove either insanity or incompetence." *Id.* at 105. Mr. Freeman "ethically and honestly" believed that he could not present evidence of mental defects at the sentencing stage simply because the experts "were not going to say [Mr. Bryan] was insane." *Id.* at 86–87. Because he believed the experts could not testify as to Mr. Bryan's insane or incompetent state, Mr. Freeman did not consider any other use he could have made from the testimony. Rather he simply assumed that the testimony "would not have been relevant at all." *Id.* at 106, 108.

### c. Counsel's Failure to Explain Importance of Evidence to His Client

Mr. Freeman also admits that if Mr. Bryan was organically brain damaged and mentally ill at the time of trial, he might not have received the death penalty. *See id.* at 110. Given Mr. Freeman's unsound investigation "which, in turn, hampered his ability to make strategic choices regarding the second-stage proceedings and competently advise his client regarding those proceedings," *Battenfield,* 236 F.3d at 1234, I believe there was no informed decision by counsel or client in this case. The OCCA held that defense counsel conducted a reasonable investigation but concluded that the failure to present the psychiatric mitigating evidence was tactical. If so, it was tactical surrender. I believe this was an unreasonable application of Supreme Court precedent. *See Williams,* 120 S.Ct. at 1522.

The OCCA relied upon Mr. Freeman's purported residual doubt strategy: to present the evidence might focus the jury on future dangerousness rather than moral culpability. There is no question that "[t]he guilt phase may . . . provide the opportunity to sow the seeds of 'residual' doubt concerning the defendant's guilt, enhancing the chances of a life sentence." James M. Doyle, *The Lawyer's Act: Representation in Capital Cases,* 8 Yale J.L. & Human. 417, 449 (1996). Counsel may further attempt to stir up any lingering doubt concerning the guilt of the defendant during the sentencing phase hoping to cause the jury to decide against the imposition of the death penalty. However, to read such a strategy into Mr. Freeman's actions is not reasonable. There was no testimony regarding Mr. Bryan's potential innocence. Mr. Freeman's closing argument, rather than suggesting that the circumstantial evidence may not point to his client, stated "Leroy should not have killed," Vol. VII, at 1753 (trial tr.), and asked the jury not to impose the death penalty here because the underlying crime did not warrant the penalty. *See id.* at 1748–1754.

In contrast to the majority, I would hold that Mr. Freeman's failure first to understand the purpose of such mitigating evidence and second to persuade his client to let him present the only evidence that could help him at the sentencing phase was deficient under *Strickland.*[2] I believe that presentation of the overwhelming evi-

---

2. I would hold so based in part on Mr. Freeman's inability to recognize, after reviewing "reams and reams" of evidence pointing to his client's mental problems, *see* Evid. Hr'g Tr. at 98, that Mr Freeman faced a duty to consider, investigate, and explain not only risks in presenting evidence of Mr. Bryan's mental history at the sentencing stage, but also the potential benefits of presenting such evidence. *See Battenfield,* 236 F.3d at 1229 (counsel's "failure to investigate [defendant]'s background, and his failure to explore other readily apparent mitigation possibilities, rendered unreasonable his alleged penalty-phase strategy. . . . [T]here was no strategic decision at all because [counsel] was ignorant of various other mitigation strategies he could have employed"); *Romano* 239 F.3d at 1179 ("The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence.");

*Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) ("The reason lawyers may not blindly follow [a client's] commands is that although the decision whether to use such evidence in court is for the client . . . the lawyer first must evaluate potential avenues and advise the client of those offering possible merit") (internal quotation marks and citation omitted); *see also Martin v. Maggio,* 711 F.2d 1273, 1280 (5th Cir.1983) (noting that defendant's "instruction that his lawyers obtain an acquittal or the death penalty did not justify his lawyers' failure to investigate the intoxication defense" and that such "[u]ncounselled jailhouse bravado, without more, should not deprive a defendant of his right to counsel's better-informed advice"); *Gaines v. Hopper,* 575 F.2d 1147, 1150 (5th Cir.1978) ("[M]eaningful discussion with one's client" is one of the "cornerstones of effective assistance of counsel.").

dence of Mr. Bryan's mental defects would have rebutted evidence that Mr. Bryan might "commit criminal acts of violence that would constitute a continuing threat to society." Okla. Stat. tit. 21, § 701.12.

### B. Prejudice

Having concluded that Mr. Freeman's performance was deficient, I would next determine whether that deficiency caused Mr. Bryan prejudice. "Because the OCCA never addressed this issue, we ... exercise our independent judgment." *Battenfield,* 236 F.3d at 1234. A petitioner is prejudiced if "there is a reasonable probability that absent the errors, the sentencer ... would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052.

Psychiatric mitigating evidence "has the potential to totally change the evidentiary picture." *Middleton v. Dugger,* 849 F.2d 491, 495 (11th Cir.1988); *see also Stephens v. Kemp,* 846 F.2d 642, 653 (11th Cir.1988) (stating that "prejudice is clear" where attorney failed to present evidence that defendant spent time in mental hospital). I conclude that the compelling and extensive evidence of Mr. Bryan's mental history rebuts the continuing threat aggravator and might also be viewed in a mitigating light as to past violent behavior. And here, we do not have to speculate as to what effects calming drugs and other treatment might have, because the record indicates that when Mr. Bryan maintains his anti-psychotic drug regimen, his delusions—and therefore his likelihood to be a threat to other inmates—are significantly reduced.

In sum, this evidence could have materially altered the balance of aggravating and mitigating factors underlying the jury's sentencing decision. The failure to present the evidence deprived the jury of a "vehicle for expressing its 'reasoned moral response'" to the substantial evidence of Mr. Bryan's mental illnesses when it rendered its sentencing decision. *Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Accordingly, I conclude there is a substantial probability the jury would have determined the mitigating circumstances outweighed the aggravating circumstances. *See Williams,* 529 U.S. at 397–98, 120 S.Ct. 1495 (holding that, in evaluating a claim of ineffective assistance of counsel premised on alleged failure to adduce mitigation evidence, courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation"); *see also Walker v. Gibson,* 228 F.3d 1217, 1234 (10th Cir.2000) (holding that in determining whether petitioner was prejudiced by counsel's failure to present additional mitigation evidence, this court considers the strength of the state's case, the aggravating circumstances the jury found, the mitigation evidence defense counsel did present, and the additional mitigation evidence defense counsel might have presented); *see generally Mayes,* 210 F.3d at 1288 (noting the "overwhelming importance" of mitigation evidence in humanizing a criminal defendant and explaining his conduct). I would therefore reverse the judgment of the district court and remand with instructions that the district court grant the writ as to Mr. Bryan's death sentence, subject to the state district court conducting a new sentencing trial. Therefore, I respectfully dissent from the Court's decision to affirm the order of the district court.

*Philip J. Murphy, Ph. D.*
CLINICAL PSYCHOLOGIST
BIOFEEDBACK NEUROPSYCHOLOGY
3100 N. BROOKLINE • SUITE 1005 • OKLAHOMA CITY, OK 73112 • (405) 942-2465

## PSYCHOLOGICAL EVALUATION

Name: Robert Leroy Bryan
Age: 53
Date of Evaluation: 5/9/94
Date of Report: 5/25/94

Tests Administered:

Hand Test
Bender-Gestalt Test
Rorschach Test
Wechsler Adult Intelligence Scale - Revised
Wide Range Achievement Test - Reading Scale
Minnesota Multiphasic Personality Inventory - 2
Relevant Records

Findings:

Mr. Bryan suffers from a psychotic thought disorder, with paranoid schizophrenic symptoms. Th eetiology of this disorder may be functional, or possibly organic. Much more extensive evaluation of a neuropsychological and a nuclear medical nature is required to delineate the various contributions towards this man's clinical conditions. Irrespective of the etiology, Mr. Bryan is seriously mentally ill, with a probable delusional system which may provide the best understanding of his role in the crimes for which he is charged.

Conclusions:

Mr. Bryan suffers from a serious mental disorder which places into serious question his competence to stand trial, as well as his legal culpability in the crimes for which he is charged.

Philip J. Murphy, Ph.D.